Carlos A. **GUTIERREZ–RODRIGUEZ,** Plaintiff, **Appellee,**

v.

Desiderio **CARTAGENA** and Domingo Alvarez, Defendants, **Appellants.**

Carlos A. **GUTIERREZ–RODRIGUEZ,** Plaintiff, **Appellee,**

v.

Pedro N. **SOTO** and Edwin F. Gotay, Defendants, **Appellants.**

Nos. 88–1881, 88–1882.

United States Court of Appeals, First Circuit.

Heard April 7, 1989.

Decided Aug. 11, 1989.

As Amended Aug. 17, 1989.

---

Zuleika Llovet, Hato Rey, P.R., with whom Hector Rivera–Cruz, Secretary of Justice, Bayamon, P.R., Rafael Ortiz Carrion, Sol. Gen., John F. Nevares and Saldana, Rey, Moran & Alvarado, Hato Rey, P.R., were on brief for Desiderio Cartagena and Domingo Alvarez.

Ivonne Gonzalez Morales for Pedro N. Soto and Edwin F. Gotay.

Judith Berkan, Santurce, P.R., with whom Peter Berkowitz, Jose Antonio Lugo and Lugo & Berkowitz, Hato Rey, P.R., were on briefs for plaintiff, appellee.

Before BOWNES and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

* Of the District of Massachusetts, sitting by designation.

BOWNES, Circuit Judge.

This case arises out of the unwarranted shooting of plaintiff-appellee, Carlos A. Gutierrez–Rodriguez, by police officers of the Commonwealth of Puerto Rico. Plaintiff, rendered a paraplegic as a result of the shooting, sued the officers involved and their supervisors under 42 U.S.C. § 1983, alleging that their actions and omissions deprived him of his constitutional rights. The jury returned a substantial verdict in favor of plaintiff assessing both compensatory and punitive damages against the defendants. Defendants now appeal on numerous assertions of error. We affirm.

## I. FACTS

We recite the facts and all reasonable inferences to be drawn therefrom in the light most favorable to plaintiff, since the jury found for him. *See Kassel v. Gannett Co.*, 875 F.2d 935, 937 (1st Cir., May 24, 1989) (citing *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987)).

On December 9, 1983, Carlos Gutierrez was a healthy 22–year old. He was regularly employed and had plans to pursue academic studies at the InterAmerican University. On that evening, Gutierrez had a date with Margarita Oquendo. He drove Oquendo to his father's house to meet his parents for the first time. The house was located in a rural, mountainous section of Barrazas, Carolina, in Puerto Rico. After the visit, Gutierrez and Oquendo left the house and drove to a nearby secluded spot. He parked the car on the side of the road with the parking lights on. They admired the night scene of San Juan just visible in the distance.

Nelson Velazquez, Edwin Gotay, Jesus Moreno [1] and Pedro Soto were members of the Carolina Drugs and Narcotics Division of the Police Department of Puerto Rico. Soto was an investigative agent, or "ninestripe," a rank which is slightly higher than patrolman. The other three were unranked police officers. On December 9, 1983, they were assigned to do "preventive rounds" in and around the Barrazas region of Carolina, with Soto in command. Gotay testified at trial that the purpose of preventive rounds was "to go to all of the places where drugs was [sic] being trafficked, and if you saw that there were [sic] drug trafficking going on you would try to intervene on that."

The preventive rounds on this night were uneventful until 11:30 p.m. At that time, the unmarked police car containing Soto, Gotay, Velazquez and Moreno came upon Gutierrez' vehicle. The officers, who were in plain clothes, quickly exited their vehicle and approached the car with guns drawn. Upon seeing unidentified men brandishing firearms approaching his car, Gutierrez hastily started his engine and began to drive away. Without warning, the officers began to fire at the car. One bullet struck Gutierrez in the back, causing him to lose control of the vehicle. The car went off the road and landed on its side in a ditch. The officers caught up with the car and set it upright. They then identified themselves as police officers and transported Gutierrez to a hospital.

Gutierrez received extensive and permanent injuries as a result of his gunshot wound. The bullet damaged his spinal cord, causing him to become a paraplegic— permanently paralyzed from the waist down.

Plaintiff sued the four officers who were at the scene under 42 U.S.C. § 1983 for depriving him of his constitutional right of liberty without due process of law. He also brought suit against Domingo Alvarez, the Director of the Carolina Drugs and Narcotics Division and Desiderio Cartagena, the Police Superintendent, alleging that their supervisory actions and omissions caused or contributed to cause his injury.

After a twelve-day trial, the jury returned a verdict in favor of the plaintiff. The jury awarded him $4.5 million in compensatory damages, jointly and severally against all defendants. Punitive damages

---

1. A default judgment was entered against defendant Moreno in August, 1985. He was not present at trial and is not a party to this appeal.

were also awarded against the individual defendants in the following amounts: Cartagena—$150,000; Alvarez—$225,000; Soto—$200,000; Velazquez—$30,000;[2] Gotay—$25,000. Defendants filed a number of post-verdict motions, all of which were denied by the trial court.

Defendants have raised the following issues on appeal:[3] (1) was the evidence sufficient to support the jury's finding of liability under § 1983; (2) was the district court's instruction concerning the standard for imposing liability on both the supervisors and the officers consistent with applicable law; (3) did the district court err in denying defendants' motion for a mistrial because of prejudicial pretrial and trial publicity; (4) did the admission of past complaints against Officer Soto constitute reversible error; (5) did the district court's refusal to permit Soto to testify at trial due to his earlier assertion of his fifth amendment privilege against testifying constitute an abuse of discretion; (6) should the jury award have been reduced or a new trial been granted on the ground that the award was excessive; and (7) was there a basis for the jury's imposition of punitive damages.

## II. LIABILITY UNDER 42 U.S.C. § 1983: SUFFICIENCY OF THE EVIDENCE

As the defendants' arguments turn on somewhat different factual and legal issues, we deal with them in two groups: the individual officers who were at the scene and their supervisors.

### A. *Individual Officers' Liability*

Soto and Gotay moved for directed verdicts at trial arguing that on the evidence presented, the jury could not have reasonably imposed liability under § 1983. While they did not move for a judgment notwithstanding the verdict, they did make a post-verdict motion for a new trial alleging that the verdict was contrary to the law and

against the weight of the evidence. Gotay made a separate motion to alter or amend the judgment under Fed.R.Civ.P. 59(e), arguing that the evidence was insufficient to establish that he was the cause of plaintiff's injuries.

We note first the standards of review that guide our inquiry. In reviewing the denial of a motion for directed verdict or for judgment notwithstanding the verdict " 'we must examine the evidence in the light most favorable to the plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion—that there is a total failure of evidence to prove plaintiff's case.' " *Mayo v. Schooner Capital Corp.*, 825 F.2d 566, 568 (1st Cir.1987) (quoting *Fact Concerts, Inc. v. City of Newport*, 626 F.2d 1060, 1064 (1st Cir.1980), *vacated on other grounds*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)); *see MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 128 (1st Cir., June 2, 1989); *Gonzalez–Marin v. The Equitable Life Assurance Society*, 845 F.2d 1140, 1144 (1st Cir.1988); *Robinson v. Watts Detective Agency*, 685 F.2d 729, 732 (1st Cir. 1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). As to the denial of a new trial motion:

[W]e will reverse a judge's decision not to grant a motion for a new trial 'only if the verdict is so seriously mistaken, so clearly against the law or the evidence, as to constitute a miscarriage of justice.' *Levesque v. Anchor Motor Freight, Inc.*, 832 F.2d 702, 703 (1st Cir.1987); *see Mayo v. Schooner Capital Corp.*, 825 F.2d 566, 570 (1st Cir.1987). This strict standard of review is especially appropriate if the motion for new trial is based on a claim that the verdict is against the weight of the evidence. *Wells [Real Estate v. Greater Lowell Board of Realtors]*, 850 F.2d [803] at 811 [ (1st Cir. 1988) ]. Thus, our review is limited solely to determining if the court abused its discretion in making this decision. *Free-*

---

**2.** Velazquez is not a party to the instant appeal.

**3.** While not all of these issues are raised by each defendant nor are they on the same substantive

or procedural footings, any distinctions among them will be dealt with in the course of the opinion.

man v. Package Machinery Co., 865 F.2d 1331, 1334 (1st Cir.1988); *Mayo,* 825 F.2d at 568.

*MacQuarrie,* at 131. The standard in reviewing a denial of a Rule 59(e) motion is, likewise, one of abuse of discretion. *See Earnhardt v. Commonwealth of Puerto Rico,* 744 F.2d 1, 3 (1st Cir.1984); *Thomas v. Farmville Manufacturing Co.,* 705 F.2d 1307, 1307–08 (11th Cir.1983).

In assessing the imposition of liability under § 1983, we must first ask "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). There are two aspects to the second inquiry: "(1) there must have been a *deprivation* of federally protected rights, privileges or immunities, and (2) the conduct complained of must have been *causally connected* to the deprivation." *Woodley v. Town of Nantucket,* 645 F.Supp. 1365, 1369 n. 4 (D.Mass.1986) (emphasis added). Since the defendants do not deny that they were acting under color of Commonwealth law, our inquiry focuses on whether there was sufficient evidence to establish both a constitutional deprivation and a causal connection between the defendants' conduct and the deprivation.

■ We have recently held that government officials may be held liable under § 1983 "for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights." *Germany v. Vance,* 868 F.2d 9, 18 (1st Cir.1989); [4] *see also infra* p. 562 (comparing standards of reckless indifference and deliberate indifference). Soto and Gotay assert that no

evidence was presented that might reasonably establish that they had acted with reckless or callous indifference to the plaintiff's constitutional rights. We disagree.

*Pedro Soto*

■ The jury could have found the following facts and drawn the following inferences against defendant Soto:

—He was in charge of the preventive round on December 9, 1983.

—The preventive rounds have no set guidelines and proceed as the officer in charge orders. That officer has direct responsibility for what occurs on the round.

—As the officer in charge, Soto would have determined the area of the patrol, against whom it would act, and how that action was to take place.

—On the night in question, Soto drove the police vehicle up to plaintiff's car.

—Under his direction, he and the other officers exited their vehicle with guns drawn.

—They proceeded to approach the Gutierrez vehicle without identifying themselves as police officers.

—As plaintiff began to drive away, he heard a number of shots. One shot was louder than all of the others. Soto was issued a shotgun for the patrol, the other officers carried revolvers.

—Officers under Soto's command discharged their weapons at plaintiff and Oquendo.

—At least five shots were fired before plaintiff was hit and his car went off the road.

—Since Soto was in command, the use of weapons by the officers involved was at his direction or, at least, was tacitly authorized by him.

These facts were more than sufficient to establish that Soto's actions amounted to a

---

**4.** The Supreme Court has left open the question whether a plaintiff must establish gross negligence, deliberate indifference, reckless or callous indifference, or intentional conduct to hold an individual state actor liable under § 1983.

See *DeShaney v. Winnebago County Dep't of Social Services,* —— U.S. ——, 109 S.Ct. 998, 1007 n. 10, 103 L.Ed.2d 249 (1989); *Daniels v. Williams,* 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 666 n. 3, 88 L.Ed.2d 662 (1986).

reckless or callous indifference to the constitutional rights of Gutierrez.

*Edwin Gotay*

■ Whether the evidence was sufficient to establish the liability of defendant Gotay is a closer question. He was not in charge of the patrol and asserts that he was asleep in the police car when plaintiff was shot. He argues that the evidence was insufficient to support a finding of liability against him. Although the evidence against Gotay was slim, we deem it sufficient.

Based on the evidence and inferences reasonably drawn therefrom, the jury could have found that Gotay exited the vehicle along with the other three officers with his gun drawn and was thus an active participant in the event that caused plaintiff's injuries. The following evidence supports such a finding:

—On cross-examination, Margarita Oquendo testified that *all* of the officers exited the vehicle.

Q: Will you please describe the locations of the agents?

A: The driver was in the front, Pedro Soto, another person was off to his right. The other two were in the front seat—excuse me in the back seat.

Q: Which one of the officers went out of the car, if you can recall?

A: Could you repeat the question, please?

Q: Which one of the agents dismounted from the car?

A: All of them got out of the car.[5]

—On direct examination Oquendo testified that the officers carried guns and pointed them at Gutierrez and her.

—Following the shooting and the righting of Gutierrez' overturned vehicle, the first officer Oquendo saw was Gotay, who was standing at the window of the car. Since Oquendo testified that it took "just seconds" for the officers to arrive at her vehicle, Gotay's presence there raises an inference that he was not asleep during the shooting. If Gotay had been asleep in the car, it would have been difficult for him to be at the car window "just seconds" after the shooting.

Given this evidence, we cannot say that no reasonable jury could have found that Gotay's actions evidenced a reckless or callous indifference to plaintiff's constitutional rights. The jury was privileged to make such a finding, and it did so.[6]

■ Both Gotay and Soto assert that the evidence did not establish that their actions were the proximate cause of plaintiff's injuries. They allege that since the bullet that entered plaintiff's body came from Officer Moreno's revolver,[7] his action must be seen as an intervening, superceding cause of the constitutional deprivation. This argument may be disposed of quickly.

Section 1983 imposes liability upon those who "subject[ ] or cause[ ] to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." This circuit has expanded upon the express words of the statute and stated that:

A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an affirmative act which he is legally required to do, that causes the deprivation of which complaint is made. [Citation omitted.] Moreover, personal participation is not the only predicate for sec-

5. While Oquendo testified on direct examination that only three officers exited the vehicle, the jury had the right to believe her cross-examination testimony rather than what she testified to on direct.

6. As we find that the jury may have concluded that Gotay was an active participant in the incident, we do not address plaintiff's second theory of liability, namely that Gotay was liable for not stopping his fellow officers from firing upon plaintiff. *See Clark v. Taylor,* 710 F.2d 4, 9 (1st Cir.1983); *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972).

7. Forensic evidence established that the bullet that entered Gutierrez' body came from Moreno's revolver.

tion 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. *Springer v. Seaman,* 821 F.2d 871, 879 (1st Cir.1987) (quoting *Soto v. City of Sacramento,* 567 F.Supp. 662, 673–74 (E.D.Cal. 1983) (citations omitted) and *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978)). The *Springer* court also noted that inquiries into causation under § 1983 are cabined within common law tort principles. *See id.* at 876–79; *see also Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2541–42, 91 L.Ed.2d 249 (1986) (noting that common-law principles control the issuance of damages under § 1983).

We have no difficulty concluding that there was a firm evidentiary basis for finding that the actions of Soto and Gotay caused plaintiff's injuries. Soto was the man in charge. He directed and participated in the acts that led to the shooting. The jury could also have found that Gotay was a participant in those acts. Gotay exited the car with his gun drawn and moved toward the Gutierrez' vehicle along with the other officers. Under such a factual scenario, the actions of all four of the officers who participated in the intervention could be deemed to be proximate causes of plaintiff's injuries. *Cf. Melear v. Spears,* 862 F.2d 1177, 1186 (5th Cir.1989) (police officer liable under § 1983 where he guarded a door during the commission of an illegal search by other officers).

■ Nor does Moreno's conduct constitute a superseding intervening cause that would relieve Soto and Gotay from liability. We have recently addressed the concept of superseding causes. In *Marshall v. Perez Arzuaga,* 828 F.2d 845, 848 (1st Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988), we stated that an actor is responsible for

those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties. *See Widow of Andino,* 93 P.R.R. at 178 (defining "intervening cause" as a cause of an injury that "comes into active operation in producing the result after the actor's negligent act or omission has occurred"). A negligent defendant will not be relieved of liability by an intervening cause that was reasonably foreseeable, even if the intervening force may have "directly" caused the harm. *Id.* An "unforeseen and abnormal" intervention, on the other hand, "breaks the chain of causality," thus shielding the defendant from liability. *Id.*

*See Springer,* 821 F.2d at 876–77 (similarly describing intervening causes in tort law). The question in the case at bar is whether Moreno's firing of his weapon—the direct cause of plaintiff's injuries—was a type of harm that Soto and Gotay could reasonably have foreseen. We believe that it was.

It was eminently foreseeable that an encounter with a civilian by four policemen with weapons drawn and ready to fire might result in a discharge of the firearms and an injury to the civilian. No matter whose bullet ultimately inflicted plaintiff's injury, the deprivation of Gutierrez' constitutional rights was the result of a team effort. The officers exited their vehicle with guns drawn. As plaintiff pulled away a number of shots, "around five or six" according to Gutierrez, were fired. That only one bullet found its mark was fortuitous, not exculpatory. We hold that the evidence was sufficient to hold Soto and Gotay liable under § 1983.

### B. *Supervisory Liability*

The Director of the Carolina Division, Domingo Alvarez, and the Superintendent of the Police Department of Puerto Rico, Desiderio Cartagena, argue that the court erred in denying their motion for judgment notwithstanding the verdict because the evidence was insufficient to support a finding of supervisory liability under § 1983. Our inquiry is governed by the same principles as those used in reviewing a denial of a

motion for directed verdict. We discern no error in the judge's ruling.

■ We have addressed the limits of supervisory liability under § 1983 in the past. We note first that liability may not be predicated upon a theory of *respondeat superior. See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901–02 (1st Cir.1988); *Guzman v. City of Cranston,* 812 F.2d 24, 26 (1st Cir.1987); *Woodley v. Town of Nantucket,* 645 F.Supp. at 1372. A supervisor "may be found liable only on the basis of her own acts or omissions." *Figueroa v. Aponte–Roque,* 864 F.2d 947, 953 (1st Cir.1989); *see Guzman,* 812 F.2d at 26. It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others. *See Germany,* 868 F.2d at 17–18. Finally, there must be "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." *Woodley,* 645 F.Supp. at 1372 (quoting *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)); *see Lipsett,* 864 F.2d at 902.

■ Our earlier cases on supervisory liability have stated that a plaintiff must establish that the supervisor's conduct constituted "gross negligence *amounting* to deliberate indifference." *See Lipsett,* 864 F.2d at 902; *Guzman,* 812 F.2d at 26; *Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). We believe there is no difference of moment between that standard and one of reckless or callous indifference. *See City of Springfield v. Kibbe,* 480 U.S. 257, 268–69, 107 S.Ct. 1114, 1120–21, 94 L.Ed.2d 293 (1987) (O'Connor, J. dissenting from dismissal of writ of certiorari) (stating that deliberate indifference or reckless disregard is necessary to establish municipal liability under § 1983); *Clipper v. Tacoma Park,* 876 F.2d 17, 20 (4th Cir.1989) (same); *Cortes–*

*Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir.) (discussing different definitions of deliberate indifference), *cert. denied,* —— U.S. ——, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); *Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir.1987); *Williams v. City of Boston,* 784 F.2d 430, 434–35 (1st Cir.1986) (using standards of reckless disregard and deliberate indifference interchangeably); *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984) (equating the two standards); *Rondon Pinto v. Jimenez–Nettleship,* 737 F.2d 130, 132 (1st Cir.1984) (using both standards as one); *Layne v. Vinzant,* 657 F.2d 468, 471, 474 (1st Cir. 1981) (same); *cf. Germany,* 868 F.2d at 18 & n. 10 (noting distinction between gross negligence—standing alone—and recklessness). We see no reason to differentiate in this context between these standards. We hold that indifference that rises to the level of being deliberate, reckless or callous, suffices to establish liability under § 1983.[8]

### Domingo Alvarez

■ The plaintiff provided more than sufficient evidence for the jury to impose § 1983 liability upon Domingo Alvarez. Plaintiff established that:

—On December 9, 1983, Alvarez was Director of the Drugs and Narcotics Division for the Area of Carolina of the Police Department of Puerto Rico.

—Prior to this time Alvarez had supervised defendant Soto at the Metropolitan Drugs and Narcotics Division.

—Alvarez testified that during his time at the Metropolitan Drugs and Narcotics Division he was aware that Soto had been the subject of a number of citizen complaints charging him with mistreatment.

—Alvarez was also aware that Soto had a reputation "for having a violent character in mistreating citizens."

—Based on these facts, Alvarez admitted that he was concerned about Soto's charac-

---

**8.** This holding is limited to cases involving supervisory liability. We are aware, of course, that in *City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1204–06, 103 L.Ed.2d 412 (1989), the Supreme Court held that to establish municipal liability under § 1983 a plaintiff must show that the actions or omissions of the municipality's policymakers "evidenced a 'deliberate indifference' to the rights of its inhabitants...."

ter and its effect upon him as a police officer.

—When Soto was being transferred to the Carolina Division, Alvarez expressed his concern about Soto's character to his captain. He suggested that a different assignment might be in order for Soto. He had also spoken with investigators from the Bureau of Investigations and Disciplinary Matters regarding the complaints against Soto.

—Alvarez admitted that he was aware that Soto had been the subject of ten citizen complaints charging abuse during his tenure with the Carolina Division. Soto and another officer in the department had the greatest number of civilian complaints lodged against them.

—Alvarez also knew that Soto had been suspended for five days in July, 1983. On that date Soto, as a round supervisor, stood by and pointed a gun while those under his command beat up a civilian doctor. Alvarez was on duty the day of that assault.

—Soto and Alvarez were friends and certain testimony indicated that Alvarez was less strict with him than with other officers.

—When Soto was moved to the Carolina Division, Alvarez was concerned for the safety of both the citizens and his own men. He feared that in response to Soto's actions a civilian riot might develop, which would threaten the safety of the officers under his command.

—As Director of the Carolina Division, Alvarez had the authority to assign Soto to a desk job. On the one or two occasions this was done, Soto demanded he be returned to the street. Alvarez complied.

—Although Alvarez testified that he wanted Soto to be transferred, Alvarez' immediate supervisor, Nelson Segarra, stated that Alvarez never filed a request for Soto to be transferred.

—Alvarez never initiated a complaint against Soto until after the Gutierrez shooting.

—Alvarez never requested that Soto be given a psychiatric evaluation.

—Despite all of his concerns and the large number of complaints against Soto, Alvarez continued to send him out to command as a round supervisor.

—On December 9, 1983, Alvarez assigned Soto to supervise the preventive round during which plaintiff sustained his injuries. Of the other officers assigned to the round, Moreno had a number of civilian complaints filed against him and Gotay was just returning to the force following a leave of absence to recuperate from an injury.

—As Director of the Carolina Division, it was Alvarez' duty to evaluate the police officers under his command every six months. Two of the categories evaluated are "self-control" and "relations with the community." He had to rate the performance of the officers on a scale from one to five, with a score of four or five indicating above average achievement.

—Alvarez evaluated Soto five times between 1981 and 1983. He never gave Soto less than a ranking of four in the categories of relations with the community and self-control.

—In his final evaluation of Soto, in July, 1983, Alvarez gave Soto fours in the relations with the community and self-control categories. This evaluation was made despite Alvarez' knowledge that three complaints had been filed against Soto in the preceding six months and that Soto had held a gun on a civilian doctor while other officers assaulted him. Alvarez was also aware of a disciplinary suspension instituted against Soto for that incident. In the same evaluation Alvarez commended Soto for his performance as round supervisor.

—Plaintiff's expert in police practice, procedure administration and discipline, Lou Reiter, testified that, given Soto's conduct, Alvarez should have taken the following basic steps regarding Soto: (1) lowered his evaluation scores to the unsatisfactory level to signal to Soto that his behavior needed improvement;[9] (2) personally ob-

9. The fours and fives that Soto received in his evaluation likely signalled to him that his behavior was acceptable—even exemplary.

served Soto in the field to determine how he dealt with civilians; (3) put in a formal, written request to his superiors requesting a transfer for Soto out of the Carolina Division; (4) have Soto undergo a psychiatric examination; (5) assigned Soto to special training classes that would have helped him better his relations with the community; (6) assigned Soto to be a "Reten," *i.e.*, an officer with a desk job; (7) started a file on Soto documenting past incidents of alleged misconduct and recording them in case future action was necessary; and (8) undertaken a personal review of Soto's arrest files and included any improper or questionable activities in Soto's file.

—Reiter believed that it was foreseeable, in 1983, that Soto might commit further acts of violence against civilians. He testified that proper and immediate supervision and discipline of Soto would likely have remedied the problem or, at the least, have resulted in Soto's dismissal from the force.

—Based on a review of the pertinent facts, Reiter concluded that Alvarez' supervision and discipline of Soto was totally deficient.

Alvarez' inaction concerning the Soto threat and his continued assignments of Soto as a round supervisor are a basis for finding that he possessed a reckless or callous indifference to the rights of those with whom Soto would come into contact. The affirmative link between Alvarez' conduct toward Soto and the shooting of Gutierrez is plain. With even the minimal amount of proper supervision and discipline it is unlikely that Soto would have been in command on December 9, 1983. Had Alvarez not been recklessly indifferent to his duties, the Soto problem would have been remedied well before that date.

### Desiderio Cartagena

■ Cartagena maintains that the evidence presented at trial was insufficient to impose liability upon him. Plaintiff argues that Cartagena is liable because: (1) he had knowledge of the numerous complaints against Soto yet took no action concerning them other than dismissing the charges;

and (2) he employed a wholly inadequate and impotent disciplinary system that permitted officers like Soto to continue to employ their bullish methods without sanction. *See, e.g., McClelland v. Facteau,* 610 F.2d 693, 697 (10th Cir.1979) (noting similar grounds for supervisory liability under § 1983).

We believe the evidence adduced by plaintiff was sufficient to sustain the jury's imposition of liability upon Cartagena. The jury could have found the following:

—On December 9, 1983, Cartagena was the Superintendent of the Police Department of Puerto Rico and had held that position since December 11, 1978. He retired from that post on December 30, 1983.

—As Superintendent, he was responsible for establishing all policies and procedures of the Police Department. He had the authority to issue "General Orders," which, along with the Personnel Regulations, served as the governing guidelines for the department.

—He was ultimately responsible for the supervision of all of the officers under his command. It was his duty to ensure that the General Orders and the Personnel Regulations were carried out by the police force.

—Cartagena was at the head of the department's disciplinary system. Every complaint filed against an officer went to Cartagena for disposition. He made the final decision, based upon the department's investigation of the matter, as to whether an officer was guilty or not guilty of misconduct.

—He was the only one with the authority to suspend, fire, or otherwise discipline a police officer. Any decision to sanction or not to sanction a particular officer was made by Cartagena.

—Under the rules and regulations governing the police disciplinary system, when a complaint was filed against an individual officer, the Bureau of Inspection and Disciplinary Matters would investigate. After a series of reviews, the Bureau would make a recommendation concerning the matter

and forward it to the Legal Division. The Director of the Legal Division would then examine all of the materials related to the case and make a final recommendation to the Superintendent.

—Cartagena testified that that recommendation accompanied the file on the case when it came to his desk.

—He stated that he did not read the entire record in the majority of cases and, instead, relied upon the recommendation of the Legal Division. In close cases, he asked the Director of the Legal Division, who stood by as he went over the complaints, to fill in the background of the cases. When asked how he knew whether it was "a close case," Cartagena stated that he relied on the Director to orient him to the cases. The jury could infer from this that Cartagena obtained at least the basic factual background on each complaint either from a discussion with the Director or from reading the file itself.

—Soto was the subject of at least 13 separate civilian complaints between 1980 and December 30, 1983.

—Cartagena personally signed letters dismissing the charges against Soto in twelve of the thirteen complaint cases.

—In 1983, the year Gutierrez was shot, Soto was the subject of five other complaints. On a single day, July 21, 1983, Cartagena dismissed one complaint against Soto and reaffirmed a five-day suspension that had initially been ordered against him on May 10, 1983 concerning a different matter.

—Cartagena testified that the volume and frequency of the complaints against Soto did not alarm him. He believed the complaints did not evidence any pattern of improper behavior. Cartagena did not order any special investigation of Soto nor did he personally attempt to check up on Soto.

—Despite his power to do so, Cartagena emphatically refused to consider an officer's past history of complaints when reviewing that officer's conduct. Indeed, the files which were brought to him for disposi-

tion did not even include the officer's prior history of complaints.

—The failure to consider officers' past histories when evaluating complaints made it very difficult to identify a pattern of misbehavior or misconduct.

—Reiter, plaintiff's expert on police matters, testified as to the need for considering past histories in assessing a particular officer's actions. He stated that the number of complaints levied against Soto alone should have signalled that he needed immediate attention. Jorge Collazo, Cartagena's successor as Superintendent, and Captain Julian Ortiz, Director of the Administrative Investigations Division for the Area of San Juan, agreed that the number of complaints against Soto was quite unusual and should have put his superiors on notice that some form of remedial action was necessary.

—Reiter maintained that there were other glaring inadequacies in the disciplinary system employed by Cartagena:

1. One of the most serious deficiencies, Reiter felt, was the provision that allowed officers who were the subject of an internal investigation to refuse to testify or give a statement to the investigating officers. Such a rule is "a really serious handicap" to an investigation of misconduct; it "cuts off one of your main sources of investigation ... the officer that was involved." By invoking such a rule an officer could easily block the department from getting to the bottom of the matter. Soto asserted this privilege in a number of the department's investigations of him.

2. The investigations of complaints against officers required witnesses to come to the station house to give sworn written statements. Reiter professed that the effect of such a requirement was to "frighten[ ] most of the average citizen[s], particularly minorities...." By its formality, the system discouraged people from coming forward with information. This hampered the department's ability to discover the truth surrounding alleged incidents of misconduct. As early as 1974, the Police Task Force Report, of which Reiter was a contributing author, denounced the require-

ment of taking sworn written statements at the investigation stage of a complaint action.

3. Under this disciplinary structure, when a citizen withdrew his complaint, the internal investigation was concluded. Reiter testified that that practice encouraged the intimidation of complainants by police officers and may have been too cumbersome to be effective. Six of the civilian complaints against Soto were withdrawn by the complainants.

4. The disciplinary system's sanctions were unduly limited. Reiter stated that, as written, the system did not allow an officer to be given additional remedial training or psychological exams as a response to findings of misconduct. Reiter believed that to function efficiently a disciplinary system must have at its disposal both remedial measures, which are designed to retrain an officer, and punishments, which are designed to sanction his or her conduct.

5. The failure to involve immediate supervisors in the disciplinary process was another flaw in the system. An officer's immediate supervisor is the department official closest to the situation. He has the most knowledge of the officer's temperament, strengths and weaknesses. His recommendation as to what type of sanction would be most effective in a particular officer's case is a valuable component of a proper disciplinary system.

6. Reiter next testified that:

There was no indication[ ], [in the disciplinary organization], that there was a system that would identify officers who had lots of complaints, whether they were founded or not. The reason you want to do that is because you want to identify those policemen, even if the complaint is unfounded, you want to say why is it that one officer gets more complaints than other officers, and then look at that person. Maybe he needs counselling, maybe he needs more supervision, maybe he needs—maybe he's burned out.

\* \* \* \* \* \*

Most officers go through their entire career with no complaints or maybe just a handful. Most officers will go through twenty-five, twenty, twenty-five, thirty years with no complaints. And so, if one officer has ten, fifteen, twenty, forty, I think one instance was forty, forty-nine complaints, something is wrong. That person is doing it different. And that's what the red flag is, to alert you even if there [sic] unfounded. Something he's doing is generating more complaints than another person and it's something that the supervisor, sergeants or the lieutenant needs to look at and that person needs to be told that you got a problem with one of your officers.

7. Reiter concluded that the disciplinary system was just going through the procedural motions without the objective of discovering the truth.

Based upon the foregoing evidence, the jury was justified in holding Cartagena liable under § 1983. It could be found that Cartagena's conduct reflected a reckless or callous indifference to the rights of the citizens of Puerto Rico. Both his failure to identify and take remedial action concerning Soto and his employment of a disciplinary system that was grossly deficient in a number of significant areas made it highly likely that the police officers under his command would engage in conduct that would deprive the citizens of Puerto Rico of their constitutional rights. Had a proper disciplinary system been in place, Soto would have been identified as an officer prone to misconduct. A number of disciplinary steps might have been taken against him in order either to change his approach to his duties or to dismiss him from the force. There was a plethora of evidence that Cartagena utilized a bankrupt disciplinary system, and took virtually no action concerning Soto; he was thus affirmatively linked to the shooting of Gutierrez.

## III. THE JURY INSTRUCTIONS

■ Cartagena and Alvarez argue that the trial judge's charge was erroneous because it failed to instruct that to hold them liable under § 1983, plaintiff must prove that this violation was not an isolated occurrence but was part of a pattern of con-

tinual violations, which were condoned by the Director and the Superintendent. Only in this way, they maintain, can plaintiff establish that a policy or custom of inadequate supervision and poor discipline existed on their watch. *See City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 923–24, 99 L.Ed.2d 107 (1988); *Oklahoma City v. Tuttle,* 471 U.S. 808, 816–18, 105 S.Ct. 2427, 2432–33, 85 L.Ed.2d 791 (1985) (plurality opinion of Rehnquist, J.); *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). This argument is meritless.

Defendants have confused the standard for imposing liability upon a *municipality,* with that for imposing liability upon individual actors. *Compare Monell,* 436 U.S. at 691, 694, 98 S.Ct. at 2036, 2037, and *Bordanaro v. McLeod,* 871 F.2d 1151, 1154–56, 1158–59 (1st Cir.1989) *with Daniels v. Williams,* 474 U.S. 327, 334–35, 106 S.Ct. 662, 666–67, 88 L.Ed.2d 662 (1986) and *Germany,* 868 F.2d at 17–18; *see generally* Annotation, *Liability of Supervisory Officials and Governmental Entities for Having Failed to Adequately Train, Supervise, or Control Individual Peace Officers Who Violate Plaintiff's Civil Rights under 42 U.S.C.S. § 1983* 70 A.L.R.Fed. 17 (1984) (collecting and comparing cases concerning subject matter of title). As we have recently stated, "government officials may be held liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights. *See, e.g., Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 831 (1st Cir.1987); *Clark v. Taylor,* 710 F.2d 4, 9 (1st Cir. 1983)." *Germany v. Vance,* 868 F.2d at 17–18. An inquiry into whether there has been a pattern of past abuses or official condonation thereof is only required when a plaintiff has sued a municipality. Where,

as in the case at bar, the plaintiff has brought suit against the defendants as individuals,[10] the standard set forth in *Germany v. Vance* applies: plaintiff need only establish that the defendants' acts or omissions were the product of reckless or callous indifference to his constitutional rights and that they, in fact, caused his constitutional deprivations. 868 F.2d at 17–18.

Though not expressly argued by the defendants, we note that the judge's charge did not instruct the jury on the reckless or callous indifference standard. Instead, the judge's charge permitted the jury to impose liability against the defendants if it found that they had been "grossly negligent." He defined that standard as follows:

Gross negligence is a form of negligence. It is based on a failure to exercise care. To find that there was gross negligence on the part of the defendants Domingo Alvarez and Desiderio Cartagena you do not have to find that they acted with intent to violate plaintiff's rights. Gross negligence differs from ordinary negligence only in degree and not in kind. It falls short of reckless disregard or consequences. Gross negligence signifies more than an ordinary inadvertence or inattention that consequences of one's act or omissions, but less than a conscious indifference to the consequence. It implies a want of the ordinary standard of care but does not require an intent to do harm.

This instruction is at odds with the reckless or callous indifference standard established by *Germany v. Vance,* 868 F.2d at 17–18. And while " 'what terms like ... reckless or gross negligence mean' has 'left the finest scholars puzzled,' " *Daniels v. Williams,* 474 U.S. at 334, 106 S.Ct. at 667 (quoting Reply Brief for Petitioner 9), the district court's definition of gross negligence imposed a lesser standard than recklessness.[11] *See Germany,* 868 F.2d at 18 & n. 10.

**10.** All defendants were sued in their individual capacities. *See Will v. Michigan Dep't of State Police,* —— U.S. ——, ——–——, 109 S.Ct. 2304, 2308–12, 105 L.Ed.2d 45 (1989) (holding that state actors may not be sued in their official capacities under § 1983).

**11.** During the trial and in other parts of the charge, the judge correctly defined the standard

**568**

Defendants failed to object specifically, as required by Fed.R.Civ.P. 51, to the district court's use of a gross negligence standard for liability. The only objection that comes close states: "We object to the instruction of gross negligence, we submitted an instruction on gross negligence which we understand defines the concept in a much better fashion and more instructive to the jury rather than the one submitted by plaintiff." Thus, defendants acquiesced in the gross negligence standard but preferred a different definition of that term. "An exception on one ground cannot serve as the basis for another, on a different ground, on appeal." *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 809 (1st Cir.), *cert. denied,* ── U.S. ──, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988) (citing *Gillentine v. McKeand*, 426 F.2d 717, 723 n. 19 (1st Cir.1970)); *City of Springfield v. Kibbe*, 480 U.S. 257, 258–60, 107 S.Ct. 1114, 1115–16, 94 L.Ed.2d 293 (1987) (where defendants never requested a standard higher than gross negligence and had proffered a gross negligence instruction of their own, the Supreme Court declined to review any subsequent argument for a higher standard of liability).

Absent a proper objection under Rule 51, we may reverse only upon a finding of plain error. *See Smith v. Massachusetts Institute of Technology*, 877 F.2d 1106, 1110 (1st Cir.1989); *Almonte v. National Union Fire Insurance Co.*, 787 F.2d 763, 769 (1st Cir.1986); *McKinnon v. Skil Corp.* 638 F.2d 270, 273 n. 2 (1st Cir.1981). We are also guided by the teaching that:

the plain error rule "should be applied sparingly and only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice." *Nimrod v. Sylvester*, 369 F.2d 870, 873 (1st Cir.1966). We have adopted the standard for plain error in the Rule 51 context expressed by professors Wright and Miller: " 'If there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously af-

fected the fairness, integrity or public reputation of judicial proceedings.' " *Morris v. Travisono*, 528 F.2d 856, 859 (1st Cir.1976) (quoting 9 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2558, at 675 (1971)).

*Wells Real Estate, Inc.*, 850 F.2d at 809.

We have reviewed the entire record in light of this standard and cannot say that the judge's utilization of the gross negligence standard constitutes plain error. What saves the judge's charge is his instruction on, and the jury's imposition of, punitive damages. The judge below gave the following instruction on punitive damages.

If you should find from the preponderance of the evidence in this case that the plaintiff is entitled to a verdict for actual or compensatory damages; and should further find that the act or omission of the defendant, which proximately caused actual injury or damage to the plaintiff, was maliciously or wantonly, or oppressively done then you may add to the award of actual damages such amount as you shall agree to be proper as punitive damages.

An act or failure to act is maliciously done if prompted or accompanied by ill will, spite or grudge, either toward the injured person individually, or towards all persons in one or more groups or categories of which the injured person is a member.

*An act or failure to act is wantonly done if done in reckless or callous disregard of, or indifference to the rights of one or more persons including the injured person.*

An act or failure to act is oppressively done if done in a way or manner which injures or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse or authority or power, or by taking advantage of some weakness, disability of another person.

\* \* \* \* \* \*

as being one of gross negligence amounting to deliberate indifference; his final instruction, however, charged the jury that defendants

would be found liable if they had been only grossly negligent.

If you decide to award any punitive damages it should be based on whether you find that the defendants acted willfully, deliberately, maliciously or with reckless disregard of the plaintiff's constitutional rights. If you find that they have done one or more of those things then you may award punitive damages which I've already indicated to you. (Emphasis added).

The standard set forth in the punitive damage instruction is as strict, if not stricter, than that required by *Germany v. Vance* to impose liability under § 1983. Since the jury returned punitive damage awards against all defendants, it follows logically that had it been correctly instructed on § 1983 liability, the jury's verdict would have remained the same. Given that finding, the error in the charge is not one that has resulted in "a clear miscarriage of justice," *Almonte*, 787 F.2d at 769, nor has it "seriously affected the fairness, integrity or public reputation of judicial proceedings." 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2558 at 675 (1971); *see also Wells Real Estate, Inc.*, 850 F.2d at 809 ("[W]e have continued to acknowledge the plain error rule without, to our knowledge, ever using it to upset a verdict."). There was no plain error here.[12]

■ Cartagena and Alvarez also fault the jury instructions for not making clear "the issue of proximate cause, specifically that an 'affirmative link' must be established between Cartagena and Alvarez' action and the unconstitutional activity of the police officers." Because defendants failed to make this objection at trial, we, again, review only for plain error.

The judge gave the following charge regarding causation:

An injury or damage is proximately caused by an act or failure to act whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the [in]jury or damage was either a direct result or a reasonable probable consequence of the act or omission.

It is true that this instruction does not use the term "affirmative link," which has been endorsed by the Supreme Court and employed by this circuit. *See Rizzo*, 423 U.S. at 371, 96 S.Ct. at 604; *Lipsett*, 864 F.2d at 902. In *Kibbe v. City of Springfield*, 777 F.2d 801 (1st Cir.1985), *cert. granted*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), *cert. dismissed as improvidently granted*, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987), the defendants, like those here, argued that the trial judge's failure to use the words "affirmative link" made his charge fatally flawed. We disagreed and stated that "[a] defendant is not entitled to any specific words of instruction, but only to instructions that properly convey the applicable law of the case." *Kibbe*, 777 F.2d at 810 (citing 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2556 (1971)); *see Bordanaro v. McLeod*, 871 F.2d at 1165–66. Although *Kibbe* concerned causation in the municipal liability context, its teaching is equally apt in the case at bar. Other decisions of this circuit as well have not mandated that the term "affirmative link" must be used. *See Guzman*, 812 F.2d at 26; *Voutour*, 761 F.2d at 820.

The district judge informed the jury that there needed to be a causal connection between the acts or omissions of the supervisors and the unconstitutional activities of the officers. He stated that the acts or omissions of the supervisors must have "played a substantial part in bringing about or actually causing the injury or damage, and that the [in]jury or damage was either a direct result or a reasonable probable consequence of the act or omission." We believe this language accurately defines the causation element necessary to establish supervisory liability under § 1983. There was no error, much less plain error, in this instruction.

## IV. PUBLICITY AND JUROR BIAS

■ Defendants Cartagena and Alvarez claim that the district court erred in deny-

---

**12.** Even if we were to find that defendants specifically objected to this instruction, we would deem the error harmless based upon the same reasoning. *See* Fed.R.Civ.P. 61.

ing their motions for mistrial based upon the prejudicial effect pretrial and trial publicity had upon the jury. Specifically, they assert that the jury was tainted by television and newspaper stories that: (1) disclosed a prior settlement that had been reached between Margarita Oquendo and the Justice Department of Puerto Rico; and (2) revealed that the Commonwealth of Puerto Rico would indemnify Cartagena and Alvarez from any damages awarded against them and referred to the Commonwealth as the "deep pocket." As stated in their written motion requesting mistrial, this claim is based on the seventh amendment right to a civil trial by an impartial jury.

In reviewing the district court rulings, we keep in mind that "[m]otions for mistrials are directed primarily to the discretion of the trial court, *United States v. Pappas,* 611 F.2d 399, 406 (1st Cir.1979), and 'will not be reversed absent abuse of discretion,' *id.* at 406, citing *United States v. Sclamo,* 578 F.2d 888, 891 (1st Cir. 1978)." *United States v. Chamorro,* 687 F.2d 1, 6 (1st Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982). We will rarely find an abuse of discretion where the district court has "undertake[n] an adequate inquiry into whether the alleged tainting incident occurred and whether it was prejudicial." *United States v. Corbin,* 590 F.2d 398, 400 (1st Cir.1979) (citing *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) and collected First Circuit cases); *see also United States v. Moreno Morales,* 815 F.2d 725, 733 (1st Cir.) ("The trial court's determination as to the impartiality of jurors may be set aside only for manifest error."), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987).

After reviewing the record, we are convinced that the district court was vigilant in guarding against the improper effects of trial publicity. The trial judge questioned the jurors on several occasions to discover if any of them were aware of or tainted by publicity discussing the trial. In the initial polling of the prospective jurors on February 29, 1988 the judge queried:

Do you know anything about the facts of this case or have you heard or read anything about this case from any source?

Do you have any reasons which could affect your impartial consideration of the case to be presented to you as a juror?

None of the prospective jurors admitted to knowledge of the case or to an inability to be impartial.

After this first polling, counsel for defendants claimed that publicity concerning settlement of Margarita Oquendo's action would make it impossible to find an impartial jury. Because of potential prejudice from the jury's knowledge of the settlement between her and the Department of Justice of Puerto Rico, the judge questioned the jury panel more specifically:

I have a question here. Have any of you here today read an article that appeared in El Vocero in today's edition on page 13 where it says "Ante De La Corte Federal"?

One prospective juror—who was later excluded from the petit jury—admitted to having read the headline but not the article itself. The judge admonished all of the prospective jurors that "[i]f during the course of this trial there is an article that appears in the newspaper or on television or on the radio that has anything to do with this case, turn it off. Turn it off."

After the petit jury was selected, the judge repeated this instruction: "As I mentioned previously to you, you should avoid reading any newspaper articles that might be published about the case and should also avoid seeing or hearing any television or radio comments about this trial."

On March 1, 1988, defendants made an oral motion for mistrial and a continuance, alleging that plaintiff and members of his family mentioned the Oquendo settlement in a press conference. As a result of this claim, the judge told plaintiff's father, who was a member of the press, that if one of the jurors became biased as a result of publicity, he would have to grant a mistrial. In an *in camera* session, the judge then questioned each juror individually about whether they had read or heard anything

about the case on radio or television. All answered in the negative.

Another oral motion for mistrial was made on March 2, 1988. Defendants complained about a newspaper article that named the Commonwealth of Puerto Rico as a party in the lawsuit and suggested that the story was the result of plaintiff's father talking to the press. The judge again warned the parties about the specter of mistrial.

On March 3, 1988, defendants again moved for mistrial because of publicity. As opposing counsel pointed out in response, however, the newspaper article that was the basis of the motion merely detailed the defendants' complaints about publicity that were made in open court the day before. Nevertheless, the jurors were summoned individually to the judge's chambers for questioning. This time, in addition to asking if the jurors had read or heard anything concerning the case, the judge also asked if they were making efforts to avoid publicity related to the case. Following the questioning, the judge said, "I think they're making an effort, honestly."

A final oral motion for mistrial was made on March 10, 1988, on the basis of repeated reports in newspaper articles that any award against Cartagena and Alvarez would be paid out of public funds. The judge again questioned each juror individually as to what they had read, seen, or heard in the media; their responses, as before, were negative. The court then received the assurances of the jurors that they would base their decision only upon the evidence presented at trial in light of the jury instructions.

None of the jurors admitted reading anything about the case in the newspapers, except for a lone juror who stated that he reads the headlines but then turns the page. It is significant that none of the headlines to the articles at issue refer in any way to the Oquendo settlement or to indemnification. The reading of a bare headline thus provides no basis for a claim of juror bias.

We find that the actions of the court in response to defendants' claim that publicity was tainting the impartiality of the jury constitute more than the "adequate inquiry" required by the case law. *See Corbin*, 590 F.2d at 400. The judge was conscientious in his efforts to resolve any doubts about whether the jury was being influenced by publicity. Each time defendants raised their concerns about the effects of publicity, the trial judge undertook a detailed, individual interrogation of each juror. He warned them to avoid contact with the media and was satisfied that they were honestly trying to comply. The district judge expressed confidence in the jurors' impartiality and the record supports his judgment. The district court was well within its discretion in denying defendants' motions for mistrial.[13]

## V. THE ADMISSION OF SOTO'S COMPLAINT FILES

Defendants next protest the admission into evidence of Plaintiff's exhibit 25, which contained case files concerning past civilian complaints against defendant Soto. Defendants make the following arguments against its admissibility: (1) it constitutes a violation of Fed.R.Evid. 404(b)'s prohibition on the use of prior bad acts evidence; (2) the prejudicial impact of the files upon the jury substantially outweighed any probative value they may have possessed; and (3) the files contained inadmissible hearsay. We address each of these concerns.

13. In *United States v. Moreno Morales*, 815 F.2d 725, 731 (1st Cir.), *cert. denied*, 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987), we held that:

[T]o have infringed the protections afforded by the due process clause and the sixth amendment, appellants must demonstrate at least one of the following: (1) the trial itself was conducted in a "circus like" atmosphere; (2) the actual jurors who sat on the case possessed fixed opinions that prevented them from judging impartially the guilt or innocence of the defendants; or (3) the community was so saturated with inflammatory publicity as to call into question the jurors' assertions and require us to presume their partiality.

None of these three factors was present in this case.

## A. *The Evidence*

As already discussed, Soto had been the subject of at least thirteen civilian complaints charging him with misconduct. In twelve of these cases, the charges were eventually dismissed. Plaintiff sought to introduce the case files of these complaints, which contained witness statements, internal reports, recommendations, and investigative findings, against Cartagena and Alvarez. It was plaintiff's theory that the files were relevant to prove: "(1) that his [Soto's] supervisors knew or should have known that he had been the subject of multiple citizen abuse complaints; and (2) that Defendant Desiderio Cartagena's system of discipline did not adequately address potential dangers such as that represented by police officers such as Pedro Soto." Brief for Appellee at 41. The judge admitted the files into evidence and carefully instructed the jury during the trial and in his final charge that the case-file evidence could only be used for those two, limited purposes.

## B. *Fed.R.Evid. 404(b) and 403*

Defendants argue that the case-file evidence should have been excluded under Fed.R.Evid. 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

They assert that the evidence was introduced for the improper purpose of tainting the jury against defendants based upon Soto's complaint history and that its prejudicial impact substantially outweighed its probative value. We cannot agree.

■ Our approach to the analysis of issues raised under Rule 404(b) is well established. *See Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 1499–1501, 1502, 99 L.Ed.2d 771 (1988) (discussing applications of Rule 404); *United States v. Fields*, 871 F.2d 188, 196 (1st Cir.1989). We must first ask whether the evidence of prior bad acts was introduced for a legitimate purpose. *See Huddleston*, 108 S.Ct. at 1499; *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 579–80 (1st Cir.) (stating that evidence must have a "special relevance" other than proving propensity), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Scelzo*, 810 F.2d 2, 4 (1st Cir.1987). If it was introduced for a proper purpose, we next determine whether considerations of substantial prejudice require its suppression under Rule 403. *United States v. Fields*, 871 F.2d at 196; *United States v. Flores Perez*, 849 F.2d 1, 4 (1st Cir.1988); *Scelzo*, 810 F.2d at 4; *see also* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[01]–[04] (1988); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[8] (1988). Both of these inquiries are governed by the abuse of discretion standard. *United States v. Santiago Soto*, 871 F.2d 200, 204 (1st Cir.1989); *Fields*, 871 F.2d at 196; *United States v. Rubio–Estrada*, 857 F.2d 845, 845–46 (1st Cir.1988).

The complaint files were relevant to prove the supervisory liability of Cartagena and Alvarez. They were not introduced to show that based upon Soto's past conduct it was likely that he participated in the Gutierrez shooting. The evidence was not used to prove conduct, period. As was repeatedly stressed by the district court, the evidence could only be used against Cartagena and Alvarez to show gross lapses in the supervision and discipline of Soto. *See In re Air Crash in Bali*, 684 F.2d 1301, 1315 (9th Cir.1982) (evidence of pilot's prior poor flight record admissible against airline to show it had notice of his inabilities). Since the evidence was relevant on that question and was not used to prove conduct, we turn to Rule 403.

■ We note first that under Rule 403 the delicate "balancing between the probative value of a piece of evidence and its prejudicial effect is committed to the trial court's discretion." *Bordanaro v. McLeod*, 871 F.2d at 1166; *see Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.1987) (collecting First Circuit cases). We search only for an abuse of discretion, *see United*

*States v. St. Michael's Credit Union,* 880 F.2d 579, 599–600 (1st Cir.1989) (collecting First Circuit authorities). We have stated: "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1335 (1st Cir.1988); *see* 1 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 403[01] (1988).

The case-file evidence was highly probative on the issue of the supervisory liability of Cartagena and Alvarez. It helped the jury determine whether the responses of Cartagena and Alvarez to the complaints against Soto were improper and whether the disciplinary system was sorely inadequate. Against this, Cartagena and Alvarez assert that the admission of the case files and testimony concerning them resulted in an adjudication on the merits of all of the past complaints against Soto. This, they argue, likely confused the jury and invited them to second-guess the conclusions of the police department that led to the dismissal of most of Soto's misconduct charges. We do not believe that either of these arguments proves an abuse of discretion. The district judge believed that the probative value of these files on the issue of supervisory liability was important and somewhat unique. While it is true that as a result of their admission, the jury had before it the facts of thirteen different cases, we cannot conclude that the confusion or prejudice caused thereby was so unfair or outrageous that it "substantially outweighed" the evidence's probative value. *See* Fed.R.Evid. 403. This is especially so where the files concerned prior, alleged misconduct of Soto—not of Cartagena or Alvarez. Any prejudice resulting from their admission would thus most strongly be felt by Soto.

 Defendant Soto also claims that the introduction of the case files unduly prejudiced his case. *See* Fed.R.Evid. 403. As stated previously, the files were not introduced to show Soto's propensity for violence or to prove that he acted in conformity with his past behavior on the night of December 9, 1983. In fact, the evidence was not introduced against Soto for any purpose. Soto argues, however, that the jury may have used that evidence for just such an improper purpose and may have held the prior incidents of misconduct against him in evaluating his case. While this is a much closer question than that presented by Cartagena and Alvarez, we find no abuse of discretion.

We base our decision primarily upon the care with which the district court instructed the jury concerning the case files. The district court judge instructed the jury that the case files could only be used for a specified and limited purpose:

Now, the purpose of this [the case-file evidence] is not to prove the character of Soto, or to show that he had a propensity for violence, that's not the purpose of introducing them in to evidence. And therefore, I instruct you that you may not consider it for such purpose. Instead you must weigh that evidence in deciding whether or not the codefendants Desiderio Cartagena and Domingo Alvarez, as the supervisors of Pedro Soto acted in a manner consistent with their responsibility. That is, whether or not they had knowledge of circumstances that could have forewarned them of plaintiff's shooting.

In addition to determining whether or not these two defendants had knowledge and failed to act within their duties, you must determine whether or not such inaction constitutes deliberate indifference or careless disregard to the constitutional rights of the plaintiff. I will later explain to you the degree of negligence needed to establish liability.

But at this time I instruct you not to consider these administrative complaints for judging Pedro Soto's character, or his propensity to violence, but to determine the nature of his supervisors' inaction and if there was a connection between that failure to act and the alleged injury to the plaintiff.

Instructions similar to the above were given four other times during the trial and were included in the judge's final charge to the jury. The instructions clearly explained the purposes for which the evidence could be used. More significantly they admonished the jury that it could not use the evidence against Soto for any purpose.

The advisory committee's note to Rule 403 states: "In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction." While we agree that limiting instructions may not always be effective, *see, e.g., United States v. Garcia-Rosa,* 876 F.2d 209, 221–22 (1st Cir. 1989), in the case at bar, we are satisfied that they were. The instructions were plain, to the point, and oft repeated.[14] We will not lightly assume that the jury disregarded such clear direction. Indeed, in the more extreme case of evaluating the effect of curative instructions following the mistaken introduction of inadmissible evidence the Supreme Court has held:

> We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, *Richardson v. Marsh,* 481 U.S. 200, 208 [107 S.Ct. 1702, 1707, 95 L.Ed.2d 176] (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States,* 391 U.S. 123, 136 [88 S.Ct. 1620, 1628, 20 L.Ed.2d 476] (1968).

*Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987).

We have been able to locate only one court of appeals decision factually on point. In *Carter v. District of Columbia,* 795 F.2d 116 (D.C.Cir.1986), evidence concerning past complaints against individual police officers was admitted to show the city's knowledge of and indifference to past misconduct in order to establish municipal liability under § 1983. Although the evidence was not offered against the individual officers and limiting instructions were given to that effect, the court held that the danger of unfair prejudice to the individual officers outweighed the probative value of the reports. *See id.* at 128–32. In making its decision, the court focused upon the fact that the evidence lacked probative value and that there were other, less prejudicial means available to establish municipal liability. *See id.* at 131–32. The court hypothesized that plaintiff could have established what type of municipal policy or custom existed concerning the review of civilian complaints merely by introducing summaries of the complaints without noting specific details or which particular officers were involved. *See id.* As the proof required to establish the existence of a municipal policy or custom does not focus on a single incident or a single officer, *see, e.g., Tuttle,* 471 U.S. at 822–24, 105 S.Ct. at 2435–37 (plurality opinion of Rehnquist, J.), the admission of the prejudicial files was deemed unnecessary.

The case at bar presents a different scenario. Here the issue focused upon the supervision of a specific, individual officer, defendant Soto. The responses of his supervisors to his past alleged misconduct and the effectiveness of the police disciplinary mechanism were highly probative on the issue of supervisory liability. Unlike in *Carter,* there were no other, less prejudicial, methods of proof available to the plaintiff. He could not have used nameless complaints as it was the involvement of Soto that made the evidence relevant. Nor could he have used only summaries of the complaints. It was necessary in evaluating the disciplinary system used by Cartagena, to examine how and why an officer with

---

**14.** Counsel for Soto also reinforced the instructions and noted the limited purpose of the evidence in her closing argument to the jury.

> But you were told at my request during the trial that you as jurors are not to consider this evidence as demonstrating defendant Pedro Soto's violent character in your consideration of the liability of this co-defendant, for the damages suffered by plaintiff Carlos Gutierrez.
>
> You may, however, consider this evidence as it relates to those defendants charged with supervisory responsibility, Domingo Alvárez and Desiderio Cartagena.

Soto's history was not "red flagged" before the night of December 9, 1983. The decision to place Soto in command of the patrol of December 9, 1983 was inextricably intertwined with Soto's past record.

The district court was obviously sensitive to the danger of prejudice that this evidence presented to Soto. He weighed that against its probative value and the curative effect of limiting instructions, and concluded that the evidence was admissible. *See Greer*, 483 U.S. at 766 n. 8, 107 S.Ct. at 3109 n. 8; *United States v. Marler*, 756 F.2d 206, 216–17 (1st Cir.1985) (noting curative effect of limiting instructions); *United States v. Gonsalves*, 668 F.2d 73, 75–76 (1st Cir.) (same), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982); *United States v. Ramirez–Amaya*, 812 F.2d 813, 817 (2d Cir.1987) (same). Our past decisions have authorized the exclusion of evidence only "in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *United States v. Zeuli*, 725 F.2d 813, 817 (1st Cir.1984) (quoting *United States v. Masters*, 622 F.2d 83, 87 (4th Cir.1980)); *see Fields*, 871 F.2d at 198 (noting same). The district court's decision to admit the case-file evidence was not an abuse of discretion.

## C. *Fed.R.Evid. 801 & 803(8)(C)*

■ Cartagena and Alvarez argue that the files and the statements contained therein are inadmissible hearsay. They maintain that under Rule 803(8)(C), only the "factual findings" contained in the reports are admissible. It is unnecessary to examine the scope of this hearsay exception because we find that the statements and the case files do not constitute hearsay.

Fed.R.Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.*" (emphasis added); *see Ricciardi v. The Children's Hospital Medical Center*, 811 F.2d 18, 20 & n. 1 (1st Cir.1987) (citing definition); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(a)[01] (1988). Plaintiffs offered these files not to prove that the allegations contained therein were true, but to show flaws both in the supervision of Soto by Cartagena and Alvarez and in the disciplinary system used by Cartagena. The question was not whether the complaints against Soto were true, but rather what was the proper supervisory response to the complaints and how did the disciplinary system deal with them.

The evidence showed that the disciplinary system used by Cartagena failed to take account of past complaints in investigating officers' conduct. This made it very difficult to detect a pattern of misconduct. There was expert testimony that, regardless of whether the complaints were true or false, the pattern established by their volume and similarity should have signalled to the supervisors that greater investigation was needed to determine what was at the bottom of the problem. The disciplinary system was not designed to reveal such patterns and neither Cartagena nor Alvarez personally acknowledged that a problem existed with Soto. Despite the aberrational number of complaints against him, Soto's supervisors turned a blind eye to the possibility of misconduct and failed to properly investigate a potentially violent officer. Instead of being "red flagged" by his supervisors, Soto received good evaluations, commendations and command responsibility. The case files were introduced for a proper, limited purpose and therefore cannot be considered hearsay. *See* Fed.R.Evid. 801(c); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 31 (1st Cir.1989); *United States v. Mazza*, 792 F.2d 1210, 1215 (1st Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987).

## VI. SOTO'S FIFTH AMENDMENT CLAIM

■ Soto claims that the district court abused its discretion by not permitting him to testify concerning the shooting of Gu-

tierrez, and that due to this error, he was denied due process of law. We disagree.

The pertinent facts are as follows. Soto appeared at his August 24, 1987 deposition without counsel and refused to answer any questions concerning the shooting incident. Plaintiff filed a motion *in limine* on October 15, 1987 to prohibit Soto from testifying at trial if he was going to assert the fifth amendment during discovery. Plaintiff's motion was granted on January 12, 1988. On January 25, 1988, Soto filed a motion for reconsideration of that order. On February 25, 1988, the court heard arguments on Soto's motion and denied it. Four days later, the trial began.

In his motion for reconsideration of the order granting plaintiff's motion *in limine,* and on appeal, Soto takes the position that he should not have to choose between asserting his fifth amendment privilege during discovery and testifying at trial.

Plaintiff contends, and the district court apparently agreed, that it would be an abuse of the fifth amendment to allow Soto to claim the privilege against self-incrimination during discovery and concurrently subject plaintiff to the possibility that at the eleventh hour he might waive the privilege and testify at trial. This, plaintiff asserts, would unduly hamper his preparation for trial.

Trial courts have broad discretion in fashioning remedies during discovery. *See National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). Discovery sanctions are appropriate "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id.* The viewpoint of *National Hockey League* was echoed in the advisory committee note to the 1983 amendment of Fed.R.Civ.P. 26: "Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." Courts have not been afraid to bar a party from testifying where doing so was necessary to prevent the "thwarting [of] the purposes and policies of the discovery rules." *Meyer*

*v. Second Judicial Dist. Court, etc.,* 95 Nev. 176, 591 P.2d 259 (1979); *see Lyons v. Johnson,* 415 F.2d 540, 541–42 (9th Cir. 1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970).

The district court's decision to bar Soto from testifying at trial due to his previous refusal to testify during discovery is supported by ample precedent.

The Federal Rules contemplate that there be "full and equal mutual discovery in advance of trial" so as to prevent surprise, prejudice and perjury. "It is an effective means of detecting and exposing false, fraudulent, and sham claims and defenses." 4 Moore, Federal Practice ¶ 26.02[2] at 1034–35. The court would not tolerate nor indulge a practice whereby a defendant by asserting the privilege against self-incrimination during pre-trial examination and then voluntarily waiving the privilege at the main trial surprised or prejudiced the opposing party.

*Duffy v. Currier,* 291 F.Supp. 810, 815 (D.Minn.1968); *accord Rubenstein v. Kleven,* 150 F.Supp. 47, 48 (D.Mass.1957), *aff'd on other grounds,* 261 F.2d 921 (1st Cir. 1958) (defendant's claim of privilege during deposition precluded his testimony as to certain evidence at trial); *Costanza v. Costanza,* 66 N.J. 63, 328 A.2d 230, 232 (1974); *see also Bramble v. Kleindienst,* 357 F.Supp. 1028, 1035 (D.Colo.1973) (applying same sanction to a plaintiff), *aff'd,* 498 F.2d 968 (10th Cir.1974), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2018, at 149 (1970) ("[I]f a party is free to shield himself with the privilege during discovery, while having the full benefit of his testimony at trial, the whole process of discovery could be seriously hampered."). We find these cases persuasive.

The Supreme Court's reasoning in an analogous situation supports the constitutionality of the holdings cited above. In *Williams v. Florida,* 399 U.S. 78, 80, 90 S.Ct. 1893, 1895, 26 L.Ed.2d 446 (1970), the Court upheld a Florida notice-of-alibi rule requiring that a criminal defendant "sub-

mit to a limited form of pretrial discovery by the State whenever he intends to rely at trial on the defense of alibi." The Court stated:

> The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as "due process" is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.

*Id.* at 82, 90 S.Ct. at 1896 (footnote omitted). The Court did not find that the Florida rule violated defendant's fifth amendment privilege.

> At most, the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that the petitioner from the beginning planned to divulge at trial.
>
> \* \* \* \* \* \*
>
> We decline to hold that the privilege against compulsory self-incrimination guarantees the defendant the right to surprise the State with an alibi defense.

*Id.* at 85–86, 90 S.Ct. at 1898.

We find the principles enunciated by the *Williams* Court instructive in the case at bar. Soto made his decision not to give deposition testimony on August 24, 1987 and held that position throughout the next six months prior to trial. The district court's decision to bar Soto's testimony did not burden his due process rights, it merely forced him to abide by his decision and protected plaintiff from any unfair surprise at trial. A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial. *See Bramble v. Kleindienst,* 357 F.Supp. at 1035–36 (citing *Lyons v. Johnson,* 415 F.2d at 541–42).

In his brief, Soto alleges two additional facts in support of his claim that the district court abused its discretion in not overturning the order granting plaintiff's motion *in limine:* (1) plaintiff's attorneys were advised on February 18, 1988 that he "was available to submit himself to a continuation of his deposition"; and (2) his prior refusal to testify was due to the fact that he did not have legal representation at the time. Plaintiff, in his appeal brief, vigorously denies that Soto offered to provide pretrial testimony and claims that Soto was represented by counsel before and after his deposition in August of 1987.

We need not resolve this factual dispute. Neither party points to anything in the record that would allow us to make an independent determination of the veracity of Soto's allegations, nor are we in the best position to do so. Four days before trial, on February 25, 1988, the court below heard oral arguments on Soto's motion for reconsideration. Presumably Soto offered both of the instant contentions at that time. Following the arguments, the district judge, the judicial actor closest to the situation, barred Soto from testifying at trial concerning the shooting of Gutierrez. We see no basis to question his ruling. The district court was within its discretion in not permitting Soto to testify at trial.

## VII. DAMAGES

All of the defendants argue that the trial judge erred in refusing to order either a retrial or remittitur because the jury's verdict was grossly excessive. Soto and Gotay make an additional assault, arguing that there should be a new trial because the verdict was based upon unfair passion and prejudice. Finally, all defendants assert that the evidence was insufficient to warrant the imposition of punitive damages. We deal with each of these arguments in turn.

### A. *Excessiveness*

Our path in reviewing the amount of a jury's verdict is well marked:

> Translating legal damage into money damages-especially in cases which involve few significant items of measurable economic loss-is a matter peculiarly

within a jury's ken. As this court has often stated, "[w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded." *Brown v. Freedman Baking Co.,* 810 F.2d at 11. On appeal, "a jury's award will be set aside only when it is so excessive 'that the district court's refusal to order a new trial constitutes a manifest abuse of discretion.'" *Joia v. Jo–Ja Service Corp.,* 817 F.2d at 918 (quoting *Rivera v. Rederi A/B Nordstjernan,* 456 F.2d 970, 975 (1st Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972)). After viewing the evidence in the light most favorable to the proponent of the verdict, *Betancourt v. J.C. Penney Co.,* 554 F.2d 1206, 1207 (1st Cir. 1977), the jury's fashioning of a price tag will not be disturbed "unless it is 'grossly excessive,' 'inordinate,' 'shocking to the conscience of the court,' or 'so high that it would be a denial of justice to permit it to stand.'" *Segal v. Gilbert Color Systems, Inc.,* 746 F.2d 78, 80–81 (1st Cir.1984) (quoting *Grunenthal v. Long Island R.R. Co.,* 393 U.S. 156, 159 & n. 4, 89 S.Ct. 331, 333 & n. 4, 21 L.Ed.2d 309 (1968)). *Accord McDonald v. Federal Laboratories, Inc.,* 724 F.2d 243, 246 (1st Cir.1984); *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico,* 536 F.2d 443, 447 (1st Cir. 1976).

*Wagenmann v. Adams,* 829 F.2d 196, 215 (1st Cir.1987). Based upon this standard, we cannot say that the jury's verdict in the instant action was so excessive as to require a new trial.

As a result of the shooting on December 9, 1983, plaintiff suffered severe and extensive injuries, resulting in his current paraplegic condition.[15] The uncontroverted evidence supplied by plaintiff, plaintiff's mother and expert medical testimony showed that, due to his condition, Gutierrez: (1) will never be able to walk and remains confined to a wheelchair; (2) cannot control his urination or bowel movements; (3) has permanent sexual disfunction with almost no hope of ever producing children; (4) will probably have a shortened life expectancy by as much as twenty years; (5) will have continuing problems with urinary tract infections and skin ulcers; (6) will suffer from a burning pain below the area of the wound that cannot be effectively treated without further damaging the spinal cord; (7) has undergone five different operations to remove infected bone and make other repairs around the original wound; (8) has developed emotional problems, including depression and aggressiveness; and (9) has attempted to commit suicide three times. Further testimony, including that of medical and economic experts, was to the effect that Gutierrez' medical and related expenses will include: (1) $24,000 that is owed to two hospitals; (2) $30.00/day for sterile catheterization equipment; (3) a $1,600 wheelchair that must be replaced every 2–4 years; (4) a specially designed van, the equipment for which alone totals $12,000; (5) remodeling his home to install ramps and widen portals; (6) long term treatment programs for paraplegics that offer psychological, physical and occupational care and cost $240,000 a year. Dr. Jaime Santiago Melendez, an economics expert, testified that even without considering the cost of long-term treatment programs, future hospitalizations, remodelling of Gutierrez' home, and pain and suffering, Gutierrez' loss of future income combined with his daily medical expenses would total between $738,000 and $964,000. Dr. Pablo Rodriguez Millan, Gutierrez' surgeon and a qualified medical expert, assessed the cost of Gutierrez' rehabilitation in the millions of dollars.

---

**15.** The district court instructed the jury that in assessing its damage award it could consider: A. Violation of his [Gutierrez'] constitutional rights to liberty and physical integrity. B. The physical harm to the plaintiff both to this date and what he will, with reasonable certainty, suffer in the future. C. The loss of his future earnings due to his inability to work. D. Emotional and mental harm to the plaintiff to date and those he will, with reasonable certainty, suffer in the future. E. The reasonable expense of medical and psychological care and those expenses such as medical supplies and equipment which he will reasonably incur in the future. And F. The extent and duration of the injuries including their continuation in the future.

Against this evidence, the defendants offered no contradictory testimony. The above facts were uncontroverted and the jury was entitled to accept all of them.

Defendants point to decisions in other cases concerning other plaintiffs in an effort to show that the award here was excessive. Although not generally considering the issue, our past decisions have eschewed comparisons to other cases in evaluating the validity of a jury's award and have instead relied upon the specific evidence adduced in the case at hand. *See Wagenmann*, 829 F.2d at 215–16; *Joia v. Jo–Ja Service Corp.*, 817 F.2d 908, 918–19 (1st Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988); *Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir.1987); *Clark*, 710 F.2d at 13–14. In the only case that we have found from our circuit that seems to have dealt with this question, former Supreme Court Justice Tom Clark, sitting by designation, stated that "the better practice is to make the award in a particular case on the basis of the facts and circumstances of that case...." *Caron v. United States*, 548 F.2d 366, 371 (1st Cir.1976); *see also United States v. 125.07 Acres of Land*, 667 F.2d 243, 251 n. 19 (1st Cir.1981) (noting, in the estimation of just compensation in condemnation proceedings, that "while comparisons to other cases ... may have a helpful place in complex condemnation cases ... the[ ] award determination must be made on a case-by-case basis ... and ... must provide a reviewing court with a clear indication of the evidence in the record upon which the[ ] award is based....").

Our sister circuits are in disagreement on this issue. Some circuit courts have expressly declared that comparisons with other cases are usually fruitless due to differences in facts, injuries, time of trial, and community estimations of appropriate compensation. *See Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1356–57 (5th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988); [16] *Neyer v. United States*, 845 F.2d 641, 644–45 (6th Cir.1988) (although noting comparisons justified if cases are very similar); *Hoskie v. United States*, 666 F.2d 1353, 1358 n. 4 (10th Cir.1981); *Herold v. Burlington Northern, Inc.*, 761 F.2d 1241, 1248 (8th Cir.), *cert. denied*, 474 U.S. 888, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985); *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988); *see also Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740, 750 (2d Cir.1984) (undertaking a comparison despite acknowledging the difficulties and limited usefulness of such an examination). Other courts have endorsed such comparisons, in part, to achieve some degree of objectivity and uniformity. *See Webb v. City of Chester*, 813 F.2d 824, 836 (7th Cir.1987) (allowing comparisons "where the case under review is but one of a series of similar cases that establish a trend in damage awards...."); *Trevino v. United States*, 804 F.2d 1512, 1515 (9th Cir.1986), *cert. denied*, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987); *Johnson v. United States*, 780 F.2d 902, 908 (11th Cir. 1986); *Haley v. Pan American World Airways*, 746 F.2d 311, 318 (5th Cir.1984).

We believe that our past decisions have been basically correct; the paramount focus in reviewing a damage award must be the evidence presented at trial. *Accord Wheat v. United States*, 860 F.2d at 1259–60. But by this holding we do not mean to say that comparisons are never of value. Where there are a series of similar cases arising out of the same context that are tried in the same locale, such an examination may be of some use. *See Webb*, 813 F.2d at 836. The value of any comparison will depend upon the similarities of the injuries, the locations and dates of the trials, and of the evidence presented therein. *See Wheat*, 860 F.2d at 1259–60; *Neyer*, 845 F.2d at 644–45; *Wakefield*, 765 F.2d at 59–60. Absent a most unusual case, however, we cannot imagine overturning a jury award that has substantial basis in the evidence presented at trial merely because

---

**16.** There is disagreement within the Fifth Circuit. *See Wakefield v. United States*, 765 F.2d 55, 59–60 (5th Cir.1985) (collecting contradictory Fifth Circuit decisions); *Wheat v. United States*, 860 F.2d 1256, 1259–60 (5th Cir.1988) (same).

the amount of the award is somewhat out of line with other cases of similar nature. If a jury's award has a foundation in the record, it will not be overturned except under the most egregious of circumstances. *See Wagenmann*, 829 F.2d at 215–15; *Joia v. Jo–Ja Service Corp.*, 817 F.2d at 918–19; *Brown*, 810 F.2d at 11; *Clark*, 710 F.2d at 13–14.

In the case at bar, the jury's award of 4.5 million in compensatory damages was adequately supported by the evidence. While it may have been a generous award, we agree with the opinion of the district court:

> The detailed testimony of plaintiff and his mother adequately support a substantial amount to compensate him, a young man, for the terrible and constant pain, permanent disability and his loss of enjoyment of life. In addition, considering his past and future medical expenses plus rehabilitation costs we find it [the award] reasonable and cannot conclude it "shocks the conscience."

What we stated over thirty years ago bears repeating today:

> There can be no doubt that the plaintiff was seriously, painfully and permanently injured, that his future earning capacity is gone or, at the least, seriously impaired, and that his suffering was long and severe and the end of it is not yet in sight. Under these circumstances we cannot say that the verdict, though large, is so excessive that the court below committed error of law in not setting it aside.

*Turner Construction Co. v. Houlihan*, 240 F.2d 435, 440–41 (1st Cir.1957).

B. *Passion and Prejudice*

 Defendants Soto and Gotay argue that the district court erred in denying them a new trial on the ground that the jury was influenced by passion and prejudice, which caused it to disregard the judge's instructions. They maintain that an entire new trial is necessary because the jury's passions may have affected its determination of liability as well as its assessment of damages. *See Evers v. Equifax, Inc.*, 650 F.2d 793, 797–98 (5th Cir. Unit B 1981) (affirming district court's ordering of a new trial due to the effect of unfair prejudice upon the jury's verdict); *Scagnelli v. Whiting*, 554 F.Supp. 77, 82 (M.D.N.C. 1982) (ordering a new trial on same grounds); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2815 (1973). We are not persuaded.

Soto and Gotay offer little or no evidence of just how passion affected the jury's verdict. They note that "[t]his was certainly a case in which passion could run high in light that plaintiff's injuries left him paralyzed from waist down and [u]ndoubtedly said fact could raise human sympathy." Brief for Appellants at 31. That a plaintiff evokes sympathy, however, does not automatically nullify a damage award. "Jurors are not expected to act as automatons, stripped of all feelings. Rather, the passion and prejudice against which the law guards are *undue* passion and *unfair* prejudice—passion and prejudice of the sort which cloud impartial scrutiny and reasoned evaluation of the facts...." *Wagenmann*, 829 F.2d at 217 (emphasis in original). Defendants have pointed to nothing, other than the amount of the award, that might indicate to us that the verdict was the product of undue passion.[17]

The size of the jury's award does not prove that the verdict was the product of undue passion. In the case at bar, as in *Wagenmann*, "[w]e have examined the district court's characterization of the jury verdicts, and have in turn assayed an independent 'appraisal of the evidence bearing on damages.' *Grunenthal v. Long Island R.R. Co.*, 393 U.S. at 159, 89 S.Ct. at 333." *Wagenmann*, 829 F.2d at 217–18. The jury's verdict here was firmly supported by the evidence presented at trial. There is no evidence that it was affected by unfair passion or prejudice. *See Turner Construction Co. v. Houlihan*, 240 F.2d at 440–41; *McCoy v. Cate*, 117 F.2d 194, 194

---

**17.** Soto and Gotay add that the imposition of punitive damages is evidence that the jury was overcome by its passions. While this might have been of some moment were punitive damages unwarranted, since we affirm the punitive damage awards, *see infra,* the argument must fail.

(1st Cir.1941) (" 'There is nothing in the trial of the case that convinces the court that the jury acted in passion or prejudice or that it did not administer substantial justice.' ") (quoting the opinion of the district court). We find that the district court was well within its discretion in refusing to order a new trial on this ground.

## C. *Punitive Damages*

Defendants finally protest that the evidence was insufficient to justify the jury's imposition of punitive damages against them.[18] The Supreme Court has made clear that: "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). This circuit has followed that command. *See Germany v. Vance*, 868 F.2d at 20; *Marin–Piazza v. Aponte–Roque*, 873 F.2d 432, 435 (1st Cir.1989); *Rowlett v. Anheuser–Busch, Inc.* 832 F.2d 194, 205–06 (1st Cir.1987); *Kercado–Melendez v. Aponte–Roque*, 829 F.2d 255, 267 (1st Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988); *Fishman v. Clancy*, 763 F.2d 485, 489 (1st Cir.1985); *Irizarry v. Quiros*, 722 F.2d 869, 872 (1st Cir.1983); *Clark v. Taylor*, 710 F.2d at 14.

We have recently put a slight gloss upon this standard by holding that "punitive damages are reserved for instances where the defendant's conduct is 'of the sort that calls for deterrence and punishment over and above that provided by compensatory damages.' " *Hernandez–Tirado v. Artau*, 874 F.2d 866, 869 (1st Cir.1989) (quoting *Smith*, 461 U.S. at 54, 103 S.Ct. at 1639.) As we have affirmed the jury's finding that the defendants acted with reckless or callous disregard of the plaintiff's constitutional rights, our present inquiry focuses upon whether the conduct of these defendants warrants "deterrence and punish-ment" beyond that sought by compensatory damages. This question need not detain us long.

The district judge charged the jury that it could impose punitive damages "in order to punish the wrongdoer for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct." The jury concluded Soto and Gotay participated in the event, which culminated in the shooting of Gutierrez. Their wholly unjustified actions caused plaintiff severe and permanent injury. In light of the court's instruction, the jury's award of punitive damages can be interpreted to reflect both its belief that additional punishment was necessary and its hope that a severe sanction in this case might deter such misconduct in the future. We see no basis to question this conclusion.

The actions and omissions of Cartagena and Alvarez are likewise sanctionable. Alvarez had direct knowledge of Soto's prior misconduct and was very concerned about Soto's character as a police officer. Instead of fulfilling his supervisory duty to take remedial action regarding Soto, Alvarez allowed him to remain in the field and, incomprehensibly, made him a round supervisor. In his evaluations of Soto, Alvarez gave him high marks in community relations and self-discipline despite both the large number of complaints against him and the disciplinary action against Soto concerning his role in the assault upon the civilian doctor. The jury could well have concluded that Alvarez' conduct was sufficiently outrageous to warrant punitive damages. In fact, the jury's award of the highest punitive damages against Alvarez not only reflects that it carefully thought out the damage awards, *see Fishman v. Clancy*, 763 F.2d at 490, but also that the jury believed Alvarez' conduct to have been the most reprehensible.

Cartagena was at once the actor furthest removed from the drama and the director of the play. He failed to take

---

18. As noted *supra,* the jury awarded punitive damages in the following amounts: Cartagena— $150,000; Alvarez—$225,000; Soto—$200,000; and Gotay—$25,000.

proper remedial and disciplinary action concerning Soto despite the number of past complaints against him. Most importantly, Cartagena utilized a disciplinary system that was grossly deficient to fulfill its purpose. Officers like Soto, who evidenced a consistent pattern of violence against civilians, could easily fall through the cracks. Witnesses could be forced into dropping complaints and officers under investigation could roadblock inquiries by asserting the fifth amendment. As the expert on police practices and procedures testified, it was a disciplinary system that was going through the procedural motions without any real objective of finding the truth. The jury's imposition of punitive damages against Cartagena can be understood to reflect its opinion that by employing such a system, Cartagena totally disregarded any basic concern for the public safety and did not take the essential steps necessary to protect the public from those in his charge. The jury's award of punitive damages sends a signal to other police superintendents that they must devise disciplinary systems that are minimally adequate to assure public safety and confidence. Such a rationale is a proper justification for the imposition of punitive damages against former Superintendent Cartagena.

We have considered the other issues raised by defendants and find them not worthy of discussion.

## VIII. CONCLUSION

For the foregoing reasons, we affirm the jury's imposition of § 1983 liability upon all defendants. We also uphold, in full, the jury's award of compensatory and punitive damages.

*Affirmed*—Costs awarded to appellee.