[NOT FOR PUBLICATION] [NOT FOR PUBLICATION]

 United States Court of Appeals
 For the First Circuit For the First Circuit

 

No. 96-1223

 ADALBERTO LIO a/k/a ALBERTO LIO,

 Plaintiff, Appellant,

 v.

 WALTER F. ROBINSON, JR., ET AL.,

 Defendants, Appellees.

 

APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge] 

 

 Before

 Lynch, Circuit Judge,  

Aldrich and Bownes, Senior Circuit Judges. 

 

Edgar L. Kelley for appellant. 
Mary Jo Harris, Special Assistant Corporation Counsel, with whom 
Merita A. Hopkins, Corporation Counsel, and Kopelman and Paige, P.C. 
were on brief for appellees.

 

 April 29, 1997
 

BOWNES, Senior Circuit Judge. Plaintiff-appellant BOWNES, Senior Circuit Judge. 

Adalberto Lio appeals from a jury finding of no liability in

his 42 U.S.C. 1983 action, Massachusetts Civil Rights

action, and Massachusetts tort claim against seven Boston

police officers and the City of Boston.1 The only issues on

appeal concern evidentiary rulings made by the district

court. We affirm the rulings.

 I. I.

 THE EVIDENCE THE EVIDENCE 

We rehearse so much of the evidence as is necessary

to understand the evidentiary rulings that are the subject of

this appeal. Our review of the evidence is made, of course,

in the light most favorable to the verdicts. Newell P.R., 

Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 18 (1st Cir. 1994). 

Plaintiff Lio had been a Boston police officer since June of

1979; his designation was patrolman. Starting in 1982, he

began exercising to build up his body. He used various gyms

in the Boston area. In the spring of 1991, he was using a

gym in Dedham, Massachusetts. In April of 1991, Sergeant-

Detective Leonard Marquardt (one of the defendants) was

informed by an officer of the Dedham Police Department that

Lio was selling drugs -- steroids -- at a gym in Dedham.

  

1. The original defendants included the Town of Dedham,
Massachusetts, and two of its police officers. Summary
judgments were granted in favor of these defendants. No
appeal has been taken from those judgments.

 -2- 2

Marquardt contacted his supervisor, Superintendent Joseph

Saia (also a defendant), and a sting operation was set in

motion. There was to be a "buy-bust." 

John Antoniou, who had been arrested previously by

Marquardt and Detective Walter F. Robinson, Jr. (another

defendant) for selling drugs, agreed to purchase a quantity

of steroids from Lio. Antoniou knew Lio from meeting him at

the gym. He was one of the persons from whom the Dedham

Police Department received information that Lio was dealing

in steroids. Antoniou was given $650 by Marquardt to make

the "buy." 

On May 23, 1991, Marquardt was informed by the

Dedham Police Department that Antoniou had arranged with Lio

to make the "buy" at 11:30 p.m. that night at the White Hen

Pantry (a convenience store) on Hyde Park Avenue in Boston.

Marquardt informed Detectives Robinson and Kenneth Beers

(another defendant), who were on duty, to be available to

observe the "buy." Marquardt met with Antoniou in Dedham

prior to the "buy." He emphasized that the "buy" had to be

visible so it could be observed by the watching police

officers. Antoniou was told to signal that the "buy" was in

progress by running his fingers through his hair.

The "buy" was not made at the White Hen Pantry.

Lio, who was in police uniform, talked briefly to Antoniou

before entering and after leaving the store. Antoniou's car

 -3- 3

followed Lio's car down Hyde Park Avenue. The observing

police officers kept their superiors apprised of the

situation by radio. The two proceeded to Austin Street and

parked about twenty feet from the intersection. The

observing officers, Detectives Beers and Robinson, were

following in Detective Beers' private car. Beers parked his

car so that he and Robinson could see both Antoniou's and

Lio's cars. They saw both men get out of their vehicles and

meet in the middle of the street. Lio thrust a bag onto

Antoniou's chest, which Antoniou threw into the passenger

side of his automobile, a white Corvette convertible with the

roof back. When the bag was subsequently examined by the

police, it was found to contain packages of steroids and

hypodermic needles.

After the "buy" had been made, Beers drove his car

to Austin Street, which was one-way, and parked it at an

angle across the street so as to block vehicles from going

forward. Beers then approached Lio. There is a difference

in the testimony as to what happened next. According to Lio,

Beers kicked and punched him. He pushed Beers away so that

he could get back into his car and leave. Beers claims that

Lio hit him hard in the midsection and knocked him down.

Beers claims that he put Lio under arrest for assaulting him.

Things then happened quickly. Lio got into his car,

a blue Toyota coupe, and began to back up at a high speed.

 -4- 4

Beers hung onto the side of Lio's car until it stopped

suddenly and he was thrown off. Lio started forward straight

at Detective Robinson. Robinson jumped to the side and fired

at Lio. His shot blew out the front side window on the

driver's side of the car. Lio then stopped and put the car

in reverse. Both Beers and Robinson fired at the rear end of

Lio's car. Two bullet holes were found in the rear bumper of

the car. Lio managed to back his car into the intersection

of Austin and West Streets. He turned into West Street.

Superintendent Robert Faherty (another defendant),

night commander of the Boston Police Force, was in the area.

He heard a radio transmission by a police officer state

"Austin toward West." As he turned onto West Street he heard

gunshots and saw a small dark sports car approaching at a

high rate of speed. Faherty, thinking that there had been a

drive-by shooting, gave chase. He followed Lio onto Enneking

Parkway. Shortly thereafter Faherty heard a crash. Faherty

saw Lio get out of his car and run into a patch of woods.

In a short time, back-up police units began to

arrive at the scene. One of the first arrivals was Officer

Cornell Patterson (another defendant). He asked Faherty

where the suspect had gone and was told, "into the woods."

Patterson took Faherty's flashlight and began a search for

Lio. He found him, and Lio surrendered. Patterson took him

to Superintendent Faherty, who told Lio that he was going to

 -5- 5

be charged with attempted murder. Faherty then gave Lio the

Miranda warnings. Lio was then taken to the area station 

house for booking. Superintendent Saia commanded

Sergeant Edward O'Donnell (the seventh police-officer

defendant) to conduct a "use of deadly force" investigation

into the shots fired at Lio and his car by Detectives

Robinson and Beers.

Lio was charged with assault with intent to murder,

assault and battery by means of a dangerous weapon (a car),

assault by means of a dangerous weapon (a car), driving to

endanger, speeding, leaving the scene of an accident, failure

to stop for a police officer, distribution of a Class E

controlled substance, unlawful possession of hypodermic

needles, and unlawful possession of syringes. In May 1994,

the District Attorney issued a nolle prosequi, dismissing the 

charges against Lio. This lawsuit followed. 

Plaintiff's complaint alleged violations of 42

U.S.C. 1983 (false arrest, excessive force, malicious

prosecution, and conspiracy to violate civil rights),

violations of the Massachusetts Civil Rights Act, Mass. Gen.

Laws ch. 12, 11I, and assault and battery, arising out of

an investigation which culminated in Lio's arrest on May 23,

1991. The plaintiff further alleged that the City of Boston

had a practice, custom or policy of allowing constitutional

violations, such as alleged in his complaint, to occur.

 -6- 6

The district court decided prior to the start of

the trial that the case against the City of Boston should be

severed from that of the police officers and tried

immediately thereafter if any of the defendant police

officers were found liable. Because the jury did not find

any of the individual defendants liable, the case against the

City of Boston was dismissed.

 II. II.

 THE ISSUES THE ISSUES 

Appellant has raised three issues, which we state

as they are set forth at page one of his brief. We review

for abuse of discretion. See Blinzler v. Marriott Int'l, 

Inc., 81 F.3d 1148, 1158 (1st Cir. 1996). 

The first issue is stated as follows:

 I. Whether the trial judge erred in
allowing Defendant's Motion In Limine To
Exclude Evidence of a Character or
Reputation Pursuant to Federal Rules of
Evidence 404(b), resulting in the
exclusion of evidence of racial animus,
to prove motive, opportunity, intent,
preparation, plan, knowledge, and
identity within Rule 404(b).

There was a hearing on defendants' motion in limine. 

Plaintiff wanted to prove through the deposition testimony of

Gregory Matthews, Jose Alfonso, Marilyn Hinton, and Brian

Latson -- all of whom were minority officers on the Boston

Police Force, and all of whom, except Alfonso, served under

defendant Marquardt -- that Marquardt harbored a racial

 -7- 7

animus toward minorities. At the hearing the district judge

stated the question as he understood it: whether Marquardt,

acting in a supervisory capacity, did something that was

motivated by racial animus. Counsel for Lio, Mr. Kelley,

agreed that that was the question. The following colloquy

then ensued:

 THE COURT: All right. Now, then it
seems to me that since that is the issue,
the existence of racial animus is not
itself an element of any claim and the
question becomes what evidence is
admissible to show that the officer did
something with racial animus. That's the
question. And that brings us directly,
then, to Rule 404, that says evidence of
a person's character that he has a racial
animus is not admissible for the purpose
of proving that action in conformity
therewith occurred on a particular
occasion. 404(a) is directly in point.

 MR. KELLEY: It would be in point if
the purpose of the offer were restricted
to proving propensity or proclivity.

 THE COURT: But what is the purpose
of the offer?

 MR. KELLEY: The purposes -- one of
the defendants here, Superintendent Saia,
a long and experienced officer who was in
charge of the operations of these
particular defendants, knowing in advance
of -- sufficient to question the racial
bias and animus of given officers in a
given station, did nothing, took no
action, as a matter of fact in testimony,
endorsed their actions.

 THE COURT: Well, you see, that
doesn't at all support an argument of
opinion or reputation in the community.
That would be an argument that would only
permit evidence that Saia himself knew

 -8- 8

about this characteristic of the other
person, so that's what you have to offer.
You can't offer --

 MR. KELLEY: That's what I'm saying
we will offer and we will prove.

 THE COURT: Well, that's not -- all
right. Then show me the proffer.

Then followed an extensive colloquy (ten transcript

pages) between the court and plaintiff's counsel. The court

ruled that the deposition testimony of the four minority

police officers could not be used. It then stated:

Now, that's not going to stop you from
making a proffer during the course of
trial. Of course, if you want to
complain about my ruling on appeal,
you're going to have to do that. And
when I hear that proffer in more detail,
I'll consider any arguments that may be
made at that time just in case it may
persuade me to a different view.

 But the view I hold at the present
time is that what you're aiming for here
is to show that Saia is liable personally
and that the only way I can determine
that that is correct is to determine that
Saia acted with racial animus and that
what you're proffering to me doesn't
cover some gaps between a particular
officer's personal view about his
experiences and, first, the inference
that that means that Marquardt has racial
animus and has that reputation, and,
secondly, that Saia knows that and,
third, that when Saia is making his
decisions he's not just making a bad
executive decision, but he's making it
with racial animus because of his own
racial animus. There are several missing
steps in the proffer of evidence.

No proffers were made during trial.

 -9- 9

On November 23, 1995, the day after defendants'

motion in limine had been granted, plaintiff filed a "Proffer 

of Evidence" to which were attached extensive excerpts of the

deposition testimony of minority Boston Police Officers

Matthews, Alfonso, Hinton, and Latson. The purpose of the

proffer is stated as follows:

 In respect of Marilyn Hinton her
testimony is replete with personal
experiences that prove conclusively that
the defendant, Leonard Marquardt had a
rampant racial animus which made her
service in Area E humiliating and
horrific as a black female police
officer. She extended his paradigmatic
racism as illustrative of the cynical
rule that police like him are "easier to
tolerate than to correct," as a pervasive
policy in Area E.

 The gist of Gregory Matthews [sic]
testimony as excerpted is that he was the
object of direct racial slurs stated by
the defendant, Leonard Marquardt, that he
heard the defendant refer to minorities
and blacks a[sic] "chincs and spics" at
page 52, and "Leroy(s)" at page 72.

 In the case of Brian Latson, his
testimony is probative on the issue that
the defendant, Leonard Marquardt, had a
propensity to usurp the functions of the
division of Internal Affairs. The
defendant, Leonard Marquardt, arrogated
to himself an excessive personal industry
in supervising minority officers.

 In the case of Jose Alfonso his
testimony is probative on the issue of a
defense that the plaintiff invented such
an animus as a defense to the criminal
and administrative charges against him
resulting from the "buy bust" operation
generated by Area E personnel (all

 -10- 10

defendants except Saia) for a spurious
execution in Dedham.

We have read the deposition testimony carefully.

We point out, first of all, that a portion of the testimony

of all the deponents is hearsay and for that reason alone

would not be admissible. Officer Alfonso obtained all his

information about Area E (the home base for Marquardt and

Lio) from Lio. Lio was Alfonso's training officer and they

were partners for a year and a half, assigned to Spanish

areas of Boston. Because of Lio's advice, Alfonso did not

work in Area E. He only knew about Marquardt from what Lio

told him. He did not know Superintendent Faherty at all.

Insofar as the proffer suggests that Alfonso had information

that the "buy-bust" sting operation was spurious and

motivated by Marquardt's racial animus, there is no such

testimony, either direct or implied, in his deposition. Nor

is there in any of the other depositions.

Officers Matthews and Hinton worked under

Marquardt, apparently at different times. Both described

Marquardt as a bigoted racist who treated minorities with

scorn and derision. According to Hinton, Marquardt was foul-

mouthed with minority women and verbally assaulted them. 

Officer Brian Latson worked under Marquardt in Area

E. He testified that he never observed anything suggesting

that either Marquardt or Detective Robinson were targeting

minority officers. He testified further that he did not

 -11- 11

think the racial climate at Area E was bad at all and he

enjoyed working there. Latson also testified under

questioning by Lio's counsel that Lio was upset with

Marquardt and "fearful" of him. Then followed testimony that

would be clearly inadmissible on relevancy and hearsay

grounds: Latson's commanding officer, Deputy Clayburn (an

African-American), called him into his office and told him

that he had heard that Latson was using steroids. Latson

denied it, and said that he had been a Christian Scientist

since he was twelve and never even took an aspirin. Latson

further said that he was willing to submit to whatever tests

that Clayburn wanted to give. It was Latson's opinion that

this inquiry was prompted by the fact that both he and Lio

were into body building and lifting weights. About the same

time, he was approached by a known drug dealer and a "street

source" for Latson, who told him that two detectives had been

inquiring about him. Latson testified that he thought

Marquardt was asking about him because of his close

relationship with Lio.

As we discern it, Lio's theory for the admission of

the deposition testimony is that it tended to prove that the

"buy-bust" sting operation was motivated by Marquardt's

racial animus against Lio. Even if we assume that Marquardt

had a strong racial animus against minority police officers,

of which the depositions of Hinton and Matthews are

 -12- 12

probative, and that Superintendent Saia knew this or should

have known it, we fail to comprehend the relevancy of the

depositions. There was no direct, circumstantial, or

inferential evidence that Lio was "set up" as a result of

Marquardt's racial animus toward minority officers. The

sting operation originated with the Dedham Police Department.

That police department informed Marquardt that Lio had been

dealing in steroids. It was the Dedham Police who selected

John Antoniou to make the "buy." Marquardt had reliable

information than an officer under his command was dealing in

drugs. He got permission from his superior officer to

proceed with the "buy-bust" sting. There is nothing in the

deposition testimony to suggest that he would have proceeded

differently had the implicated officer been white instead of

Hispanic. We think the deposition testimony could have been

excluded on the grounds of relevancy alone.

The district court was surely correct in excluding

the deposition testimony on the grounds of Federal Rule of

Evidence 404(a):

Rule 404. Character Evidence Not Rule 404. Character Evidence Not
Admissible To Prove Conduct; Exceptions; Admissible To Prove Conduct; Exceptions;
Other Crimes Other Crimes

 (a) Character evidence generally. (a) Character evidence generally.
Evidence of a person's character or a
trait of character is not admissible for
the purpose of proving action in
conformity therewith on a particular
occasion, except: . . .

Nor does it fall within the ambit of exception (b):

 -13- 13

 (b) Other crimes, wrongs, or acts. (b) Other crimes, wrongs, or acts.
Evidence of other crimes, wrongs, or acts
is not admissible to prove the character
of a person in order to show action in
conformity therewith. It may, however,
be admissible for other purposes, such as
proof of motive, opportunity, intent,
preparation, plan, knowledge, identity,
or absence of mistake or accident,
provided that upon request by the
accused, the prosecution in a criminal
case shall provide reasonable notice in
advance of trial, or during trial if the
court excuses pretrial notice on good
cause shown, of the general nature of any
such evidence it intends to introduce at
trial.

Clearly, the purpose of plaintiff's proffer was "to

prove the character" of Marquardt "in order to show action in

conformity therewith." And since the proffer does not come

within any of the exceptions in the second sentence because

there is no evidence in the depositions showing any of the

other purposes, the district court correctly excluded the

deposition testimony.

Appellant argues that Gutierrez-Rodriguez v. 

Cartagena, 882 F.2d 553 (1st Cir. 1989), is precedent for 

admitting the depositions into evidence. Gutierrez involved 

a 42 U.S.C. 1983 civil rights action brought against police

officers of the Commonwealth of Puerto Rico for the

unwarranted shooting of the plaintiff, rendering him a

paraplegic. In that case the district court allowed in

evidence under Rule 404(b) thirteen case files of the police

 -14- 14

officer who shot the plaintiff. We affirmed the admission,

stating:

 The complaint files were relevant to
prove the supervisory liability of
Cartagena and Alvarez. They were not
introduced to show that based upon Soto's
past conduct it was likely that he
participated in the Gutierrez shooting.
The evidence was not used to prove
conduct, period. As was repeatedly
stressed by the district court, the
evidence could only be used against
Cartagena and Alvarez to show gross
lapses in the supervision and discipline
of Soto.

Id. at 572. This is not precedent for admitting the 

depositions in this case. Quite the contrary! The other

cases cited by appellant in support of admitting the

depositions are even more attenuated. Even if an argument

could be made that the statements provide proof of motive,

the evidence was extremely weak for the reason already given.

The sting was orchestrated by the Dedham Police.

The second issue as stated by appellant is: 

II. Whether the trial judge erred in
denying Plaintiff-Appellant's Motion In
Limine to Permit The Introduction of John
Antoniou's Criminal Record after hearing
and as renewed during the course of the
trial.

This issue does not require extended discussion.

Antoniou was not a witness at the trial. Appellant alleges

that he fled the jurisdiction. His deposition was not taken.

Lio's attorney injected Antoniou into the case on his direct

examination of Marquardt:

 -15- 15

Q: (By Mr. Kelley): Did you have
 any other words with John
 Antoniou at that meeting other
 than what you've said here?
A: (By Marquardt): No.
Q: Did any of the other
 participants in this discussion
 have any words directly with
 John Antoniou that you
 overheard?
 . . .
A: I don't remember any.
Q: Did John Antoniou say anything?
A: Yes.
Q: What did he say?
Ms. Harris: Objection. Hearsay, your 
 Honor.
The Court: Overruled. 
A: He said that he could buy drugs
 from (indicating) Adalberto
 Lio.
Q: He said he could buy drugs?
A: Yes sir, he did.
Q: Did he then move on from that
 and say, "I will attempt to buy
 drugs from Adalberto Lio?"
A: That's what I thought he was there for.
 . . .
Q: And Antoniou at Area E told you
 that he was willing to try to
 arrange a sale of steroids from
 (indicating) Adalberto Lio, is
 that correct?
A: Yes, sir.

The court instructed the jury, after the statements

of Antoniou had been admitted, as follows:

 THE COURT: Now, I think I should
give the limiting instruction that
[statements of Antoniou are] not being
received to prove the truth of the
statements made, but it has to come in
because it's information that bears upon
any charge of probable cause or acting
without probable cause against various
people . . . even if some of the
information . . . is hearsay within
hearsay, it's still information that is

 -16- 16

being passed along and is taken into
account in the whole array of information
that the officers who are defendants, if
they have that information, it's part of
the information they take into account in
determining whether action is
appropriate.

 MR. KELLEY: I guess, then, your
Honor, what I would request the Court to
do is, as specifically as possible,
emphasize that this is not being received
for the purpose of the truth of any --

 THE COURT: I'll do that.

Lio did not object to this instruction; to the

contrary, he acquiesced in it.

Finally, the record makes it clear that the police

officers who dealt with Antoniou, including Marquardt, knew

and acknowledged that he had a criminal record. Under all

the circumstances here, it was not error for the district

court to exclude the specifics of Antoniou's prior criminal

record.

The third and final issue raised by appellant is

stated:

 III. Whether the trial Judge erred
in denying Plaintiff's Motion In Limine
to Permit the Introduction of
Massachusetts Superior Court "Nolle
Prosequi" and related papers under
Federal Rules of Evidence, Rules 201 and
803(8)(C) and in applying the so called
"Bad Acts" restriction of Rule 404(b) to
that evidence.

Some explanation is in order. The district court

allowed Lio to read to the jury the nolle prosequi docket 

 -17- 17

entries. The jury was then instructed that these entries

were terminations in favor of the plaintiff and satisfied one

element of the malicious prosecution claim.

The district court did not allow in evidence a two

and one half page statement by the Suffolk County District

Attorney giving the reasons for the nolle prosequi. This 

statement was clearly hearsay; it was an out-of-court

statement offered for the truth of what was contained

therein. And as the court explained fully to Lio's counsel

at the pretrial hearing on the motions in limine, it did not 

fall within the hearsay exception of Federal Rule of Evidence

803(8)(C), which permits the introduction into evidence of 

records, reports, statements, or data
compilations, in any form, of public
offices or agencies, setting forth,
. . . . in civil actions and proceedings
and against the Government in criminal
cases, factual findings resulting from an
investigation made pursuant to authority
granted by law, unless the sources of
information or other circumstances
indicate lack of trustworthiness.

The following colloquy took place:

 THE COURT: Now, what is the factual
finding that you're proposing to offer
here?

 MR. KELLEY: The finding that, as is
recited in the nolle prose itself,
evidence was compromised by police
officers, internal contradictions between
--

 THE COURT: Wait a minute. Wait a
minute. Where is that finding? Read me
the language that you say constitutes --

 -18- 18

 MR. KELLEY: "Because of
deficiencies in the way Boston Police
officers controlled and handled the
informant as well as physical evidence in
this case" -- that's a factual
determination -- "there is," therefore,
"a substantial likelihood that the
Commonwealth cannot establish a prima
facie case . . . ."

 THE COURT: All right. Now, I'm
trying to look for some finding there
that is related to an issue in this case.
Findings that are immaterial to this
case, of course, don't come into evidence
in this case. Findings that are
immaterial to this case, of course, don't
come into evidence in this case.

 MR. KELLEY: Of course.

 THE COURT: It's only findings that
are material to this case.

 Now, there is not an identification
of what the deficiencies were, so I am
not able to tell whatever the person, the
official making this finding was
referring to, and unless I can determine
what the official was referring to, then
I cannot determine whether it's related
to an issue in this case or instead is
immaterial to an issue in this case.
This is even worse than receiving
reputation evidence or something like
that that's a generalized statement
that's not in point for this case.

 So, you see the problem I'm having
is with the notion that there are, quote,
factual findings, unquote, here that are
material to the issues in this case. The
mere fact that there are factual findings
in the report doesn't make it admissible
in this case. It covers only one of the
aspects concerned with whether the
evidence is admissible in this case. It
has to be a factual finding that has
materiality to the issues in this case
and I am not able to tell from this form

 -19- 19

of factual findings either (1) precisely
what the deficiencies are or (2) how they
affected or would affect the likelihood
of drawing an inference in this case on
some issue that has to be decided by the
factfinder in this case.

 MR. KELLEY: Under subsection (C),
as I understand it, that's the purpose of
allowing a report on the part of an
official who is required to investigate
and report.

 THE COURT: If the official were
required to investigate and make a report
on whether Saia acted with racial animus,
then that would be an issue that is
involved in this case, but that's not
what this finding is about.

 MR. KELLEY: No, it isn't, your
Honor. It isn't offered for that.

 THE COURT: So the finding has to be
about something that is an issue in this
case for it to be admissible in this
case. I don't receive evidence in this
case of any kind, witnesses, direct or
findings of an official, unless it's on a
matter that is material to this case and
that's what's missing here. There's no
basis on which I can determine that the
official here has made a finding on an
issue that will be for the jury to
consider in this case.

 MR. KELLEY: The next paragraph,
your Honor: "Prior statements and sworn
testimony of certain police and civilian
witnesses necessary to proving the
Commonwealth's case are directly
contradictory in material aspects."

 I submit, your Honor, that's the
province of the District Attorney.

 THE COURT: Well, wait a minute.
No, it's the province of this jury. If I
determine that there is -- in receiving
evidence on admissibility determine that

 -20- 20

there are contradictory statements, then
I tell this jury: "That's for you to
resolve, not for anybody else. Not for
me, certainly not for some official other
than an official of this court."

We affirm the court's exclusion of the District

Attorney's report for the reasons stated by the court in the

colloquy.

We have considered carefully appellees' motion for

sanctions. We deny it.

The judgment of the district court is affirmed. affirmed. 

Costs on appeal awarded to appellees. Costs on appeal awarded to appellees. 

 -21- 21