USCA1 Opinion

 

 [NOT FOR PUBLICATION] [NOT FOR PUBLICATION] United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 96-1223 ADALBERTO LIO a/k/a ALBERTO LIO, Plaintiff, Appellant, v. WALTER F. ROBINSON, JR., ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge,  _____________ Aldrich and Bownes, Senior Circuit Judges. _____________________ ____________________ Edgar L. Kelley for appellant. _______________ Mary Jo Harris, Special Assistant Corporation Counsel, with whom ______________ Merita A. Hopkins, Corporation Counsel, and Kopelman and Paige, P.C. __________________ ________________________ were on brief for appellees. ____________________ April 29, 1997 ____________________ BOWNES, Senior Circuit Judge. Plaintiff-appellant BOWNES, Senior Circuit Judge. ____________________ Adalberto Lio appeals from a jury finding of no liability in his 42 U.S.C. 1983 action, Massachusetts Civil Rights action, and Massachusetts tort claim against seven Boston police officers and the City of Boston.1 The only issues on appeal concern evidentiary rulings made by the district court. We affirm the rulings. I. I. THE EVIDENCE THE EVIDENCE ____________ We rehearse so much of the evidence as is necessary to understand the evidentiary rulings that are the subject of this appeal. Our review of the evidence is made, of course, in the light most favorable to the verdicts. Newell P.R., ____________ Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 18 (1st Cir. 1994). _________________________ Plaintiff Lio had been a Boston police officer since June of 1979; his designation was patrolman. Starting in 1982, he began exercising to build up his body. He used various gyms in the Boston area. In the spring of 1991, he was using a gym in Dedham, Massachusetts. In April of 1991, Sergeant- Detective Leonard Marquardt (one of the defendants) was informed by an officer of the Dedham Police Department that Lio was selling drugs -- steroids -- at a gym in Dedham.  ____________________ 1. The original defendants included the Town of Dedham, Massachusetts, and two of its police officers. Summary judgments were granted in favor of these defendants. No appeal has been taken from those judgments. -2- 2 Marquardt contacted his supervisor, Superintendent Joseph Saia (also a defendant), and a sting operation was set in motion. There was to be a "buy-bust."  John Antoniou, who had been arrested previously by Marquardt and Detective Walter F. Robinson, Jr. (another defendant) for selling drugs, agreed to purchase a quantity of steroids from Lio. Antoniou knew Lio from meeting him at the gym. He was one of the persons from whom the Dedham Police Department received information that Lio was dealing in steroids. Antoniou was given $650 by Marquardt to make the "buy."  On May 23, 1991, Marquardt was informed by the Dedham Police Department that Antoniou had arranged with Lio to make the "buy" at 11:30 p.m. that night at the White Hen Pantry (a convenience store) on Hyde Park Avenue in Boston. Marquardt informed Detectives Robinson and Kenneth Beers (another defendant), who were on duty, to be available to observe the "buy." Marquardt met with Antoniou in Dedham prior to the "buy." He emphasized that the "buy" had to be visible so it could be observed by the watching police officers. Antoniou was told to signal that the "buy" was in progress by running his fingers through his hair. The "buy" was not made at the White Hen Pantry. Lio, who was in police uniform, talked briefly to Antoniou before entering and after leaving the store. Antoniou's car -3- 3 followed Lio's car down Hyde Park Avenue. The observing police officers kept their superiors apprised of the situation by radio. The two proceeded to Austin Street and parked about twenty feet from the intersection. The observing officers, Detectives Beers and Robinson, were following in Detective Beers' private car. Beers parked his car so that he and Robinson could see both Antoniou's and Lio's cars. They saw both men get out of their vehicles and meet in the middle of the street. Lio thrust a bag onto Antoniou's chest, which Antoniou threw into the passenger side of his automobile, a white Corvette convertible with the roof back. When the bag was subsequently examined by the police, it was found to contain packages of steroids and hypodermic needles. After the "buy" had been made, Beers drove his car to Austin Street, which was one-way, and parked it at an angle across the street so as to block vehicles from going forward. Beers then approached Lio. There is a difference in the testimony as to what happened next. According to Lio, Beers kicked and punched him. He pushed Beers away so that he could get back into his car and leave. Beers claims that Lio hit him hard in the midsection and knocked him down. Beers claims that he put Lio under arrest for assaulting him. Things then happened quickly. Lio got into his car, a blue Toyota coupe, and began to back up at a high speed. -4- 4 Beers hung onto the side of Lio's car until it stopped suddenly and he was thrown off. Lio started forward straight at Detective Robinson. Robinson jumped to the side and fired at Lio. His shot blew out the front side window on the driver's side of the car. Lio then stopped and put the car in reverse. Both Beers and Robinson fired at the rear end of Lio's car. Two bullet holes were found in the rear bumper of the car. Lio managed to back his car into the intersection of Austin and West Streets. He turned into West Street. Superintendent Robert Faherty (another defendant), night commander of the Boston Police Force, was in the area. He heard a radio transmission by a police officer state "Austin toward West." As he turned onto West Street he heard gunshots and saw a small dark sports car approaching at a high rate of speed. Faherty, thinking that there had been a drive-by shooting, gave chase. He followed Lio onto Enneking Parkway. Shortly thereafter Faherty heard a crash. Faherty saw Lio get out of his car and run into a patch of woods. In a short time, back-up police units began to arrive at the scene. One of the first arrivals was Officer Cornell Patterson (another defendant). He asked Faherty where the suspect had gone and was told, "into the woods." Patterson took Faherty's flashlight and began a search for Lio. He found him, and Lio surrendered. Patterson took him to Superintendent Faherty, who told Lio that he was going to -5- 5 be charged with attempted murder. Faherty then gave Lio the Miranda warnings. Lio was then taken to the area station _______ house for booking. Superintendent Saia commanded Sergeant Edward O'Donnell (the seventh police-officer defendant) to conduct a "use of deadly force" investigation into the shots fired at Lio and his car by Detectives Robinson and Beers. Lio was charged with assault with intent to murder, assault and battery by means of a dangerous weapon (a car), assault by means of a dangerous weapon (a car), driving to endanger, speeding, leaving the scene of an accident, failure to stop for a police officer, distribution of a Class E controlled substance, unlawful possession of hypodermic needles, and unlawful possession of syringes. In May 1994, the District Attorney issued a nolle prosequi, dismissing the _____ ________ charges against Lio. This lawsuit followed.  Plaintiff's complaint alleged violations of 42 U.S.C. 1983 (false arrest, excessive force, malicious prosecution, and conspiracy to violate civil rights), violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, 11I, and assault and battery, arising out of an investigation which culminated in Lio's arrest on May 23, 1991. The plaintiff further alleged that the City of Boston had a practice, custom or policy of allowing constitutional violations, such as alleged in his complaint, to occur. -6- 6 The district court decided prior to the start of the trial that the case against the City of Boston should be severed from that of the police officers and tried immediately thereafter if any of the defendant police officers were found liable. Because the jury did not find any of the individual defendants liable, the case against the City of Boston was dismissed. II. II. THE ISSUES THE ISSUES __________ Appellant has raised three issues, which we state as they are set forth at page one of his brief. We review for abuse of discretion. See Blinzler v. Marriott Int'l, ___ ____________________________ Inc., 81 F.3d 1148, 1158 (1st Cir. 1996). ____ The first issue is stated as follows: I. Whether the trial judge erred in allowing Defendant's Motion In Limine To Exclude Evidence of a Character or Reputation Pursuant to Federal Rules of Evidence 404(b), resulting in the exclusion of evidence of racial animus, to prove motive, opportunity, intent, preparation, plan, knowledge, and identity within Rule 404(b). There was a hearing on defendants' motion in limine. __ ______ Plaintiff wanted to prove through the deposition testimony of Gregory Matthews, Jose Alfonso, Marilyn Hinton, and Brian Latson -- all of whom were minority officers on the Boston Police Force, and all of whom, except Alfonso, served under defendant Marquardt -- that Marquardt harbored a racial -7- 7 animus toward minorities. At the hearing the district judge stated the question as he understood it: whether Marquardt, acting in a supervisory capacity, did something that was motivated by racial animus. Counsel for Lio, Mr. Kelley, agreed that that was the question. The following colloquy then ensued: THE COURT: All right. Now, then it seems to me that since that is the issue, the existence of racial animus is not itself an element of any claim and the question becomes what evidence is admissible to show that the officer did something with racial animus. That's the question. And that brings us directly, then, to Rule 404, that says evidence of a person's character that he has a racial animus is not admissible for the purpose of proving that action in conformity therewith occurred on a particular occasion. 404(a) is directly in point. MR. KELLEY: It would be in point if the purpose of the offer were restricted to proving propensity or proclivity. THE COURT: But what is the purpose of the offer? MR. KELLEY: The purposes -- one of the defendants here, Superintendent Saia, a long and experienced officer who was in charge of the operations of these particular defendants, knowing in advance of -- sufficient to question the racial bias and animus of given officers in a given station, did nothing, took no action, as a matter of fact in testimony, endorsed their actions. THE COURT: Well, you see, that doesn't at all support an argument of opinion or reputation in the community. That would be an argument that would only permit evidence that Saia himself knew -8- 8 about this characteristic of the other person, so that's what you have to offer. You can't offer -- MR. KELLEY: That's what I'm saying we will offer and we will prove. THE COURT: Well, that's not -- all right. Then show me the proffer. Then followed an extensive colloquy (ten transcript pages) between the court and plaintiff's counsel. The court ruled that the deposition testimony of the four minority police officers could not be used. It then stated: Now, that's not going to stop you from making a proffer during the course of trial. Of course, if you want to complain about my ruling on appeal, you're going to have to do that. And when I hear that proffer in more detail, I'll consider any arguments that may be made at that time just in case it may persuade me to a different view. But the view I hold at the present time is that what you're aiming for here is to show that Saia is liable personally and that the only way I can determine that that is correct is to determine that Saia acted with racial animus and that what you're proffering to me doesn't cover some gaps between a particular officer's personal view about his experiences and, first, the inference that that means that Marquardt has racial animus and has that reputation, and, secondly, that Saia knows that and, third, that when Saia is making his decisions he's not just making a bad executive decision, but he's making it with racial animus because of his own racial animus. There are several missing steps in the proffer of evidence. No proffers were made during trial. -9- 9 On November 23, 1995, the day after defendants' motion in limine had been granted, plaintiff filed a "Proffer __ ______ of Evidence" to which were attached extensive excerpts of the deposition testimony of minority Boston Police Officers Matthews, Alfonso, Hinton, and Latson. The purpose of the proffer is stated as follows: In respect of Marilyn Hinton her testimony is replete with personal experiences that prove conclusively that the defendant, Leonard Marquardt had a rampant racial animus which made her service in Area E humiliating and horrific as a black female police officer. She extended his paradigmatic racism as illustrative of the cynical rule that police like him are "easier to tolerate than to correct," as a pervasive policy in Area E. The gist of Gregory Matthews [sic] testimony as excerpted is that he was the object of direct racial slurs stated by the defendant, Leonard Marquardt, that he heard the defendant refer to minorities and blacks a[sic] "chincs and spics" at page 52, and "Leroy(s)" at page 72. In the case of Brian Latson, his testimony is probative on the issue that the defendant, Leonard Marquardt, had a propensity to usurp the functions of the division of Internal Affairs. The defendant, Leonard Marquardt, arrogated to himself an excessive personal industry in supervising minority officers. In the case of Jose Alfonso his testimony is probative on the issue of a defense that the plaintiff invented such an animus as a defense to the criminal and administrative charges against him resulting from the "buy bust" operation generated by Area E personnel (all -10- 10 defendants except Saia) for a spurious execution in Dedham. We have read the deposition testimony carefully. We point out, first of all, that a portion of the testimony of all the deponents is hearsay and for that reason alone would not be admissible. Officer Alfonso obtained all his information about Area E (the home base for Marquardt and Lio) from Lio. Lio was Alfonso's training officer and they were partners for a year and a half, assigned to Spanish areas of Boston. Because of Lio's advice, Alfonso did not work in Area E. He only knew about Marquardt from what Lio told him. He did not know Superintendent Faherty at all. Insofar as the proffer suggests that Alfonso had information that the "buy-bust" sting operation was spurious and motivated by Marquardt's racial animus, there is no such testimony, either direct or implied, in his deposition. Nor is there in any of the other depositions. Officers Matthews and Hinton worked under Marquardt, apparently at different times. Both described Marquardt as a bigoted racist who treated minorities with scorn and derision. According to Hinton, Marquardt was foul- mouthed with minority women and verbally assaulted them.  Officer Brian Latson worked under Marquardt in Area E. He testified that he never observed anything suggesting that either Marquardt or Detective Robinson were targeting minority officers. He testified further that he did not -11- 11 think the racial climate at Area E was bad at all and he enjoyed working there. Latson also testified under questioning by Lio's counsel that Lio was upset with Marquardt and "fearful" of him. Then followed testimony that would be clearly inadmissible on relevancy and hearsay grounds: Latson's commanding officer, Deputy Clayburn (an African-American), called him into his office and told him that he had heard that Latson was using steroids. Latson denied it, and said that he had been a Christian Scientist since he was twelve and never even took an aspirin. Latson further said that he was willing to submit to whatever tests that Clayburn wanted to give. It was Latson's opinion that this inquiry was prompted by the fact that both he and Lio were into body building and lifting weights. About the same time, he was approached by a known drug dealer and a "street source" for Latson, who told him that two detectives had been inquiring about him. Latson testified that he thought Marquardt was asking about him because of his close relationship with Lio. As we discern it, Lio's theory for the admission of the deposition testimony is that it tended to prove that the "buy-bust" sting operation was motivated by Marquardt's racial animus against Lio. Even if we assume that Marquardt had a strong racial animus against minority police officers, of which the depositions of Hinton and Matthews are -12- 12 probative, and that Superintendent Saia knew this or should have known it, we fail to comprehend the relevancy of the depositions. There was no direct, circumstantial, or inferential evidence that Lio was "set up" as a result of Marquardt's racial animus toward minority officers. The sting operation originated with the Dedham Police Department. That police department informed Marquardt that Lio had been dealing in steroids. It was the Dedham Police who selected John Antoniou to make the "buy." Marquardt had reliable information than an officer under his command was dealing in drugs. He got permission from his superior officer to proceed with the "buy-bust" sting. There is nothing in the deposition testimony to suggest that he would have proceeded differently had the implicated officer been white instead of Hispanic. We think the deposition testimony could have been excluded on the grounds of relevancy alone. The district court was surely correct in excluding the deposition testimony on the grounds of Federal Rule of Evidence 404(a): Rule 404. Character Evidence Not Rule 404. Character Evidence Not Admissible To Prove Conduct; Exceptions; Admissible To Prove Conduct; Exceptions; Other Crimes Other Crimes (a) Character evidence generally. (a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: . . . Nor does it fall within the ambit of exception (b): -13- 13 (b) Other crimes, wrongs, or acts. (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. Clearly, the purpose of plaintiff's proffer was "to prove the character" of Marquardt "in order to show action in conformity therewith." And since the proffer does not come within any of the exceptions in the second sentence because there is no evidence in the depositions showing any of the other purposes, the district court correctly excluded the deposition testimony. Appellant argues that Gutierrez-Rodriguez v. ________________________ Cartagena, 882 F.2d 553 (1st Cir. 1989), is precedent for _________ admitting the depositions into evidence. Gutierrez involved _________ a 42 U.S.C. 1983 civil rights action brought against police officers of the Commonwealth of Puerto Rico for the unwarranted shooting of the plaintiff, rendering him a paraplegic. In that case the district court allowed in evidence under Rule 404(b) thirteen case files of the police -14- 14 officer who shot the plaintiff. We affirmed the admission, stating: The complaint files were relevant to prove the supervisory liability of Cartagena and Alvarez. They were not introduced to show that based upon Soto's past conduct it was likely that he participated in the Gutierrez shooting. The evidence was not used to prove conduct, period. As was repeatedly stressed by the district court, the evidence could only be used against Cartagena and Alvarez to show gross lapses in the supervision and discipline of Soto. Id. at 572. This is not precedent for admitting the ___ depositions in this case. Quite the contrary! The other cases cited by appellant in support of admitting the depositions are even more attenuated. Even if an argument could be made that the statements provide proof of motive, the evidence was extremely weak for the reason already given. The sting was orchestrated by the Dedham Police. The second issue as stated by appellant is:  II. Whether the trial judge erred in denying Plaintiff-Appellant's Motion In Limine to Permit The Introduction of John Antoniou's Criminal Record after hearing and as renewed during the course of the trial. This issue does not require extended discussion. Antoniou was not a witness at the trial. Appellant alleges that he fled the jurisdiction. His deposition was not taken. Lio's attorney injected Antoniou into the case on his direct examination of Marquardt: -15- 15 Q: (By Mr. Kelley): Did you have any other words with John Antoniou at that meeting other than what you've said here? A: (By Marquardt): No. Q: Did any of the other participants in this discussion have any words directly with John Antoniou that you overheard? . . . A: I don't remember any. Q: Did John Antoniou say anything? A: Yes. Q: What did he say? Ms. Harris: Objection. Hearsay, your __________ Honor. The Court: Overruled. _________ A: He said that he could buy drugs from (indicating) Adalberto Lio. Q: He said he could buy drugs? A: Yes sir, he did. Q: Did he then move on from that and say, "I will attempt to buy drugs from Adalberto Lio?" A: That's what I thought he was there for. . . . Q: And Antoniou at Area E told you that he was willing to try to arrange a sale of steroids from (indicating) Adalberto Lio, is that correct? A: Yes, sir. The court instructed the jury, after the statements of Antoniou had been admitted, as follows: THE COURT: Now, I think I should give the limiting instruction that [statements of Antoniou are] not being received to prove the truth of the statements made, but it has to come in because it's information that bears upon any charge of probable cause or acting without probable cause against various people . . . even if some of the information . . . is hearsay within hearsay, it's still information that is -16- 16 being passed along and is taken into account in the whole array of information that the officers who are defendants, if they have that information, it's part of the information they take into account in determining whether action is appropriate. MR. KELLEY: I guess, then, your Honor, what I would request the Court to do is, as specifically as possible, emphasize that this is not being received for the purpose of the truth of any -- THE COURT: I'll do that. Lio did not object to this instruction; to the contrary, he acquiesced in it. Finally, the record makes it clear that the police officers who dealt with Antoniou, including Marquardt, knew and acknowledged that he had a criminal record. Under all the circumstances here, it was not error for the district court to exclude the specifics of Antoniou's prior criminal record. The third and final issue raised by appellant is stated: III. Whether the trial Judge erred in denying Plaintiff's Motion In Limine to Permit the Introduction of Massachusetts Superior Court "Nolle Prosequi" and related papers under Federal Rules of Evidence, Rules 201 and 803(8)(C) and in applying the so called "Bad Acts" restriction of Rule 404(b) to that evidence. Some explanation is in order. The district court allowed Lio to read to the jury the nolle prosequi docket _____ ________ -17- 17 entries. The jury was then instructed that these entries were terminations in favor of the plaintiff and satisfied one element of the malicious prosecution claim. The district court did not allow in evidence a two and one half page statement by the Suffolk County District Attorney giving the reasons for the nolle prosequi. This _____ ________ statement was clearly hearsay; it was an out-of-court statement offered for the truth of what was contained therein. And as the court explained fully to Lio's counsel at the pretrial hearing on the motions in limine, it did not __ ______ fall within the hearsay exception of Federal Rule of Evidence 803(8)(C), which permits the introduction into evidence of  records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth, . . . . in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness. The following colloquy took place: THE COURT: Now, what is the factual finding that you're proposing to offer here? MR. KELLEY: The finding that, as is recited in the nolle prose itself, evidence was compromised by police officers, internal contradictions between -- THE COURT: Wait a minute. Wait a minute. Where is that finding? Read me the language that you say constitutes -- -18- 18 MR. KELLEY: "Because of deficiencies in the way Boston Police officers controlled and handled the informant as well as physical evidence in this case" -- that's a factual determination -- "there is," therefore, "a substantial likelihood that the Commonwealth cannot establish a prima facie case . . . ." THE COURT: All right. Now, I'm trying to look for some finding there that is related to an issue in this case. Findings that are immaterial to this case, of course, don't come into evidence in this case. Findings that are immaterial to this case, of course, don't come into evidence in this case. MR. KELLEY: Of course. THE COURT: It's only findings that are material to this case. Now, there is not an identification of what the deficiencies were, so I am not able to tell whatever the person, the official making this finding was referring to, and unless I can determine what the official was referring to, then I cannot determine whether it's related to an issue in this case or instead is immaterial to an issue in this case. This is even worse than receiving reputation evidence or something like that that's a generalized statement that's not in point for this case. So, you see the problem I'm having is with the notion that there are, quote, factual findings, unquote, here that are material to the issues in this case. The mere fact that there are factual findings in the report doesn't make it admissible in this case. It covers only one of the aspects concerned with whether the evidence is admissible in this case. It has to be a factual finding that has materiality to the issues in this case and I am not able to tell from this form -19- 19 of factual findings either (1) precisely what the deficiencies are or (2) how they affected or would affect the likelihood of drawing an inference in this case on some issue that has to be decided by the factfinder in this case. MR. KELLEY: Under subsection (C), as I understand it, that's the purpose of allowing a report on the part of an official who is required to investigate and report. THE COURT: If the official were required to investigate and make a report on whether Saia acted with racial animus, then that would be an issue that is involved in this case, but that's not what this finding is about. MR. KELLEY: No, it isn't, your Honor. It isn't offered for that. THE COURT: So the finding has to be about something that is an issue in this case for it to be admissible in this case. I don't receive evidence in this case of any kind, witnesses, direct or findings of an official, unless it's on a matter that is material to this case and that's what's missing here. There's no basis on which I can determine that the official here has made a finding on an issue that will be for the jury to consider in this case. MR. KELLEY: The next paragraph, your Honor: "Prior statements and sworn testimony of certain police and civilian witnesses necessary to proving the Commonwealth's case are directly contradictory in material aspects." I submit, your Honor, that's the province of the District Attorney. THE COURT: Well, wait a minute. No, it's the province of this jury. If I determine that there is -- in receiving evidence on admissibility determine that -20- 20 there are contradictory statements, then I tell this jury: "That's for you to resolve, not for anybody else. Not for me, certainly not for some official other than an official of this court." We affirm the court's exclusion of the District Attorney's report for the reasons stated by the court in the colloquy. We have considered carefully appellees' motion for sanctions. We deny it. The judgment of the district court is affirmed. affirmed. ________ Costs on appeal awarded to appellees. Costs on appeal awarded to appellees. ____________________________________ -21- 21